CAROLINE A. JOOR et al. *v.* DANIEL O. WILLIAMS et al.

1. TRUSTS AND TRUSTEE: TRUSTEE CANNOT ACQUIRE INTEREST IN TRUST ESTATE.—A trustee is bound not to do anything which can place him in a position inconsistent with the interest of his *cestui que trust*, or which has a tendency to interfere with the proper discharge of his duty; and hence, he cannot, under any circumstances, become the purchaser of the trust estate, or acquire an interest in it adverse to the beneficiary. And this rule is founded upon grounds of public policy, and is necessary for the proper administration of trust estates, by removing all temptation for the trustee to abuse his trust.

2. SAME: DUTY OF TRUSTEE TO PRESERVE TRUST ESTATE.—A trustee, having accepted a trust in favor of infants, is bound to use reasonable diligence and care to preserve the estate for the *cestuis que trust.*

3. SAME: SAME: CASE IN JUDGMENT.—A trustee, in a voluntary conveyance made by the father for the benefit of his infant children, ought to interpose to prevent the trust estate from being taken in satisfaction of the grantor's debts, which were subsisting at the date of the conveyance, by compelling the creditors to exhaust first the property of the grantor not conveyed in the trust deed.

4. SAME: PARTY HAVING NOTICE, CANNOT ACQUIRE AN INTEREST THROUGH A VIOLATION OF TRUSTEE'S DUTY.—A third person cannot acquire any interest in a trust estate through a violation of duty on the part of the trustee, if he have notice of the misconduct of the trustee; nor can he acquire such interest through the enforcement of the paramount claims of creditors, if he co-operated with the trustee in enforcing such claims, when it was the trustee's duty to have taken steps to prevent it.

5. SAME: PURCHASE BY TRUSTEE AT JUDICIAL SALE FRAUDULENT AS TO INFANT CESTUIS QUE TRUST.—After the rendition of a judgment against a principal and his two sureties, the principal made a voluntary conveyance of a part of his property, in trust, to one of the sureties, who accepted the trust, for the grantor's minor children. The sureties afterwards, by agreement with the creditor, purchased the trust estate at a judicial sale made to collect the judgment, as trustees for the creditor, but under an agreement that they should have the absolute title whenever they paid the judgment. A third person afterwards paid the judgment, and took from the sureties a conveyance of the title, and filed a bill in equity against the grantor and the infant *cestuis que trust*, and procured a decree setting aside the trust deed, upon the ground that it was fraudulent as to creditors, and also a confirmation of his title. Held, that the proceedings were a fraud upon the rights of the infant *cestuis que trust*, and that a court of equity would grant them relief against all the parties. HANDY, J., dissented.

APPEAL from the Chancery Court of Issaquena county. Hon. J. S. Yerger, chancellor.

On the 24th day of November, 1841, the New Orleans Canal and Banking Company recovered a judgment in the United States Circuit Court for the Southern District of this State, against George Joor for $3717. Execution issued on this judgment, and was levied on personal property of the said Joor, who thereupon gave a forth-coming bond, with Mordecai Powell and William Rushing as his sureties. This bond was forfeited, and became a judgment on the 28th March, 1842.

On the 1st of March, 1841, said Joel became indebted to Lambeth & Thompson in the sum of $1622, and on this indebtedness, said Lambeth & Thompson recovered a judgment in the same court against said Joor for the sum of $1825 17, on the 23d November, 1842. Execution issued on this judgment, and was levied on personal property, and a forthcoming bond given, with the said Mordecai Powell as surety, which bond was forfeited on the 1st of May, 1843.

On the 8th June, 1843, a *fi. fa.* issued on this last-mentioned judgment on the forthcoming bond, and was levied on a part of the land in controversy (312$\frac{82}{100}$ acres). This land was advertised for sale on the 1st Monday in November, 1843; but, as appears by the marshal's return, it was not sold "for want of bidders," and the execution was credited with $85 44, part of the costs due. On the 5th of December, 1843, a *venditioni exponas* issued, under which the marshal advertised the land for sale on 4th March, 1844; and on that day did sell it, as hereafter stated.

On the 16th February, 1844, pending the advertisement for the sale of the land, Lambeth & Thompson assigned the judgment to Payne & Harrison, and on the same day Payne & Harrison, in writing, authorized said Powell & Rushing to act as their agents "in settling and concluding the said execution, with directions to proceed to have the property liable sold, and to buy in the same for Payne & Harrison at the sale, and hold it as trustees for them;" and accordingly the said Powell purchased the property on the succeeding 4th of March, "as trustees for plaintiffs' assignees," as stated in the marshal's return, for the sum of $100.

On the 3d June, 1844, an *alias fi. fa.* was issued on this judgment and levied on six slaves, as the property of the defendant Joor. This execution was returned by the marshal: "Stayed, by

order of plaintiff, November 4th, 1844." And this indorse-ment is also on it: "The marshal is hereby directed to return this execution not acted on, and the clerk is directed not to issue the execution till further orders. Signed, Mordecai Powell, one of plaintiffs' trustees in this case."

The record of the judgment, and the proceedings thereon, are exhibited with the bill filed by Williams against the present com-plainants, and as a part of the record in said suit, are exhibited with the present bill.

The record of the judgment in favor of the Canal Bank is referred to as an exhibit in the bill of Williams; but, as it is stated in the present bill, is not on file, and is not therefore embraced in the transcript of the suit by Williams exhibited in this case. But, from the allegations in Williams's bill, it appears that an execution issued on the judgment on the forfeited forthcoming bond in favor of the Bank, against Joor the principal, and Powell & Rushing the sureties; and that said execution was levied on the remaining portion of the lands in controversy, being $561\frac{8}{100}$ acres, and on the 4th of March, 1844 (the date of the marshal's sale of the lands under the Lambert & Thompson judgment), the said lands, under a *pluries venditioni exponas*, were sold to said Powell & Rushing, as trustees of the Canal Bank (the plaintiffs), for the sum of $2818 84.

The purchases made by Powell & Rushing under both of their judgments, were made in pursuance of agreements previously en-tered into by them and Payne & Harrison, and by them and the Canal Bank, that they were to make said purchases in their own names as trustees, which as is above stated, was done; and that upon payment by them to the said Payne & Harrison, and the bank, of the amount of their judgments, they, the said Powell & Rush-ing, were to be the absolute owners of said lands.

On the 9th of June, 1845, Powell conveyed to Chilton and Swenney about thirty slaves, in trust, to secure the payment of $1925 54 to Payne & Harrison, the same being the balance due them as assignees of the said judgment in favor of Lambeth & Thompson against Joor. This deed is indorsed, "Satisfied, Febru-ary 18, 1847."

No deed was executed by the marshal to Powell & Rushing for these purchases; but, on the 16th November, 1846, upon motion

made by the purchaser, and " upon satisfactory proof that said judgment had been satisfied by them" (as is stated in Williams's bill), the court ordered the successor in office of the marshal who made the sale, to make deeds to the said Powell & Rushing for the said lands, which was accordingly done on the 3d of that month.

On the 21st November, 1846, Powell & Rushing conveyed all the lands purchased by them at said marshal's sale. This deed recites that the said lands had been conveyed to Williams by Powell in a deed of prior date ; and also that Powell & Rushing had purchased them under execution sale as trustees for the plaintiffs, as above set forth; and it then proceeds, " that the said Powell & Rushing, trustees as aforesaid, for and in consideration of the premises, and in further consideration of the payment by said Williams of the money set forth in said execution to the plaintiffs respectively, the said trustees do hereby bargain, sell, release, and quitclaim unto the said D. O. Williams, his heirs, &c., forever, all the right, title, and interest in them vested by virtue of said executions and sales as aforesaid."

On this deed are indorsed by Powell & Rushing several receipts for payments made by him on said execution, amounting altogether to the sum of $7300. One of these receipts, being for $1000, was dated 5th December, 1846 ; the others were without date.

On the 30th of March, 1842, two days after the rendition of the judgment against Joor, Powell & Rushing, on the forthcoming bond given to the Canal Bank, the said George Joor, for and in consideration of the sum of five dollars, and of love and affection, conveyed all the lands aforesaid, and one negro slave, in trust to the said William Rushing, for the use and benefit of the grantor's two minor children, Caroline A. and Laura G. Joor. This deed is signed and sealed by the grantor and the trustee, and was acknowledged and filed for record the day of its date.

On the foregoing state of facts, D. O. Williams (having, as before stated, purchased the lands from Rushing & Powell) filed his bill, in the Superior Court of Chancery, against said George Joor and his two minor children, in November, 1847.

This bill set out the facts as heretofore stated, and alleged that the said deed by Joor to Rushing, in trust for his children, was made

with the intent to hinder, delay, and defraud his creditors, particularly Lambeth & Thompson and the Canal Bank; and that said Joor had, at the date of its execution, no property out of which said judgments could be satisfied, except that conveyed by the said deed; and that Powell & Rushing had paid the said judgments in full, in pursuance of their agreement with the plaintiffs therein. He afterwards filed an amended bill, in which he stated, that the allegation in his original, that Joor had no property to satisfy said judgments, except that conveyed in this deed, should have been modified by adding thereto, "to the best of his knowledge and belief," and that he had paid said judgments for Powell & Rushing.

The decree asked was, that the said deed from Joor to Rushing, in trust for his children, might be declared fraudulent and void.

George Joor answered this bill, on 8th of April, 1848, and admitted the facts charged in the bill, except the fraud charged in the execution of the deed by him to Rushing. On that point, he admitted that the conveyance to his children was without valuable consideration, and that he made it, not knowing that it was illegal and void, with the view of advancing the interest of said children. He further stated, that at the time of making said conveyance he had no property, except that embraced in the deed, out of which the said executions could be satisfied. He disclaimed all interest in the land, and submitted the rights of his children to the court.

On the 14th June, 1848, L. V. Dixon was appointed guardian *ad litem* for the minor defendants, and filed the usual formal answer. Joor having died, the suit was revived against his administrator, E. W. Shelby. In January, 1849, the depositions of said William Rushing and of one Green P. Long were taken, on behalf of complainant, on notice given to Shelby, the administrator.

William Rushing testified that he knew the parties to the conveyance, and was made trustee; does not recollect the date of the conveyance, but it was "in June, 1840 to 1843." Does not know the object of the conveyance; but "it was my opinion, that the conveyance was made to evade payment to his creditors, and to secure to his children his property named in the deed." He did not know the age of the children of Joor; and did not know that Joor was indebted to them, or that they or their guardian was privy to the deed. The deed, as well as he can recollect, was made to

witness, with promise by Joor, that it should be no trouble to him thereafter. The children then lived in Wilkinson county.

Green P. Long knew nothing material.

The guardian *ad litem* indorsed on these depositions his consent that they should be read in evidence against his wards.

This was all the evidence taken.

The chancellor, at the December term, 1849, decreed relief as prayed for, "saving to the said minors the time allowed by law, not exceeding six months, to contest the decree."

On the 10th October, 1856, the present bill was filed in the Chancery Court of Issaquena county, where the lands are situated, by said Caroline A. Joor, who had arrived at full age, and by said Laura G. Joor, who was still a minor, and sued by her next friend, against said Williams, Powell & Rushing.

The bill sets out the substance of the bill of Williams and the proceedings thereon, and filed a transcript of the record in that case as an exhibit.

The bill further charges, that when said decree was rendered, they were infants of tender years; that Laura G. is still a minor, and Caroline A. arrived at full age on the 29th August, 1855; that the land conveyed to them was worth, at the time of the conveyance, about $30,000; that their father was then in possession of and cultivating the same, and had a large number of slaves and other personal property, and considered himself, and was considered by his neighbors, as wealthy, and that if Rushing had proved faithful to his trust, the land would have been saved to them; that the father was a man of intemperate habits, and for the last three or four years of his life was incapable of attending to business. That he had ample means to pay said judgments, is shown by the levy of one of them on six slaves, which were returned to him; that the land is one of the most valuable plantations in Issaquena county, and was sold to Williams at a grossly inadequate price, which of itself is evidence of fraud.

The bill then attacks the validity of the levy and sale of the marshal on the lands, for the omission to state the county in which the lands were situated, and of the survey under which it was sold by the United States; and because it is not stated in the return that the land was sold at the county seat of Issaquena county.

The bill alleges the following additional errors in the decree in favor of Williams:

1. The record shows that Rushing was a trustee for complainants, and that he could not therefore purchase said lands at marshal's sale, or acquire any interest in them inconsistent with their rights; and that Williams was fully aware of all the facts constituting Rushing a trustee, when he bought; and that from the proof appearing on said record, the only decree that could be lawfully rendered, was to decree that Williams had a lien on the land for what he had advanced in payment of said judgments, and after deducting reasonable rents whilst it was occupied by Powell & Rushing, and himself.

2. There was no legal proof against complainants that Williams had paid said judgments, the receipts on the deed being no evidence against him.

3. There was no legal proof against complainants of the allegation in the bill that said deed was voluntary, the deposition of W. Rushing having been taken without notice to their guardian *ad litem*, who was incompetent to waive the irregularity.

4. Said Rushing was an incompetent witness to destroy a deed to which he was a party, and he was also interested to set aside the decree.

The prayer is, that Williams may be declared a trustee for complainants; that an account be stated, and that Williams, Powell & Rushing be credited with the amount paid in satisfaction of said judgments, and for all permanent and valuable improvements made on the land, and charged with the rent; and if any balance is found against complainants, they offer to bring it into court and pay it; and if the balance should be against the other parties, they pay for a decree against them for it. They also prayed that the said decree rendered in favor of Williams " be reviewed, reversed, and set aside," and for general relief.

Powell & Rushing filed a general demurrer to the bill. Williams answered, denying fraud, and demurred.

The demurrer was sustained by the chancellor, and the bill dismissed; and therefore the complainants appealed.

*Brooke* and *Smedes*, for appellants.

The objection that more than six months has elapsed since one

of the complainants arrived at full age, and that she is not there-fore within the saving of the decree, cannot avail: but under the authority of the case of *Masters et al.* v. *Dunn et al.* 1 George, 264, we contend that her right is saved until the bar also attaches to that of the other. At the date of the decree both were minors. The remedy and rights reserved to them in the decree were joint. The right of action under that reservation accrued at the date of the decree, and both being then within the saving, both must continue within the saving as long as one of them remains under the age of twenty-one. In addition to this, we submit, that before an infant can be barred of his reserved right, he must be served with notice, after arrival at age, to come in and contest the decree, and the limitation only commences to run against him from the date of such service. We have been unable to find any case settling the prac-tice in this State in this respect. Such, however, is the practice in England and in New York. Bingham on Inf. 132; 1 Barb. Ch. Prac. 334. It is certainly reasonable that such notice should be given, for an infant cannot be presumed to know that there is any decree against him. His defence is always merely formal, and made by a guardian *ad litem*, appointed by the court for the pur-pose.

It was urged in the court below, that this bill was premature, and should not have been filed until the arrival at age of the infant com-plainant. An infant is not bound to wait until he becomes of age to show cause against a decree, but may apply for that purpose as soon as he thinks fit. Bingham on Inf. 130; *Bennett* v. *Lee*, 2 Atk. 528; 1 Barbour Ch. Prac. 334.

As to the mode by which an infant may take advantage of the reservation in his favor, it is well settled that it may be done by bill of review, rehearing, or by original bill. See *Richmond* v. *Taylieur*, 1 P. Wms. 756; Bingham on Inf. 130; 1 Barbour Ch. Prac. 334. He may also make full defence and put in a new answer. 1 Barbour Ch. Prac. 334; *Fountain* v. *Cain*, 1 P. Wms. 504; *Bennett* v. *Lee*, 2 Atk. 531; Bingham on Inf. 132; *Lytton* v. *Lytton*, 4 Brown C. R. 441; *Napier* v. *Effingham*, 2 P. Wms. 401; Bro. P. C. 340; 1 Daniel Ch. Prac. 222, 1st edition; *Wright* v. *Miller*, 1 Sanf. 103.

From the foregoing authorities and from reason, an infant has

the right, as matter of course, to reopen the decree and make new defence, and is not confined to errors apparent in the decree or on the record. The reopening is granted as matter of privilege, and his defence may be new matter *dehors* the record. Herein an infant's bill differs from an ordinary bill of review.

But be this as it may, we contend that the decree of the chancellor is erroneous, and that the error is patent on the face of the record. In the first place, conceding that the conveyance by Joor for the benefit of his children was, as is charged, made for the purpose of hindering and delaying his creditors, it was not void to all intents and purposes, but only as to his creditors. As between the parties and privies to it, it was valid and effectual.

The creditors in this case were represented by Powell & Rushing, who obtained control of the judgments in favor of the Canal Bank and of Lambeth & Thompson, and had the land sold under them, and became the purchasers thereof. Rushing was the trustee, in the conveyance by Joor, for the benefit of his children, and had accepted the trust by signing it. He was, therefore, a party to it, and could not himself, or by his assignee and privy, Williams, be heard to complain of its fraudulent intent.

Being a trustee, he could not act in opposition to the interests of his *cestui que trusts*, and for his own benefit. It is almost superfluous to cite authorities on this point, as the doctrine relative to the duties, disabilities, and liabilities of trustees, particularly those for infants, is perhaps better settled, and more familiar to the profession than any other branch of the law. We will, however, cite a few among the many that present themselves. Hill on Trustees, 534, *et seq.*; 2 Sug. on Vendors, 111, 112; Bing. on Inf. 135; *Allen* v. *Sayer*, 2 Vern. 368.

"If a trustee or executor compound debts or mortgages, or buy in for less than is due, he shall not take the benefit of it to himself, for when he takes a trust he takes it for the benefit of the *cestui que trust*. He cannot be permitted to raise in himself an interest opposite to that of the party for whom he acts. 2 Fonb. b. 2, ch. 7, § 7; *Van Horne* v. *Fonda*, 5 J. C. R. 408. "An executor is not permitted to buy in a debt, and afterwards make that debt a means to sell and buy in the property for his own benefit." Ib.

"When a person undertakes to act for another, he is not allowed

to deal in the subject-matter of such agency on his own account, and for his own benefit. And if such agent takes a conveyance in his own name of an estate which he undertook to obtain for another, he will, in equity, be considered as holding the estate in trust for his principal, for whom he undertook to act as agent in the purchase. *Sweet et al.* v. *Jacocks et al.* 6 Paige, 355.

" Trustees who buy in an outstanding incumbrance against a trust estate, are only entitled to hold such incumbrance as a security for the amount actually paid by them therefor, with the interest thereon." *Quackenbush* v. *Leonard et al.* 9 Paige, 334. " It is a rule of equity, of universal application, that no person can be permitted to purchase an interest in property, where he has a duty to perform which is inconsistent with the character of purchaser." *Torrey & Gilbert* v. *Bank of Orleans,* 9 Ib. 650. " If a trustee, though strictly honest, should buy for himself an estate of his *cestui que trust,* and should then sell it for more, according to the rules of a court of equity, from general policy, and not from any peculiar imputation of fraud, he would be held still to remain a trustee, and not be permitted to sell to or for himself." 1 Story Eq. § 331, *et seq.*

Williams and Powell stand in no better condition than Rushing. The former does not allege in his bill that he and Powell had no notice of the trust and of Rushing's relation to it. The circumstances of the case, as detailed by himself, on the contrary, render it extremely probable that they all three were cognizant of the whole matter, and confederated and combined together to get possession of the land.

One fact is disclosed by the exhibit to Williams's bill, which sets out the judgment in favor of Lambeth & Thompson, which goes far to show a fraudulent intent on the part of Powell & Rushing, in reference to the trust property. It is shown that they controlled said execution, had it levied on a part of the land, and purchased it for the sum of $100. Subsequently they had the same execution levied on five slaves, which levy they afterwards released, and had the property returned to Joor.

Had they, or at least had Rushing, had a wish merely to insure payments of the judgments, these negroes would have been sufficient for the purpose without a resort to the trust property. The

inference is clear that their sole object was to get possession of the land regardless of the interests of the infants which had been committed to one of them. These negroes had been in possession of Joor all the time, for the same exhibit shows that they had been levied on previous to the sale of the land, and bonded by Joor, with Powell as surety.

Fair dealing and a desire on their part to protect the interests of these infants, would have prompted them to enforce the collection of both judgments out of the negroes, so as to have saved the land for the purposes of the trust. The whole amount of both judgments was only about $5000, and by means of their machinations, they obtain a plantation charged to be worth from twenty-five to thirty thousand dollars.

Another palpable error in the record, is the admission of the testimony of Rushing against these infant defendants. No notice was ever given to the guardian *ad litem*, and he could not give his consent that it should be read. A guardian *ad litem* can consent to nothing by which the rights of his wards may be affected. He is bound to require strict proof of everything that is alleged against them. Besides, Rushing was clearly an incompetent witness, being directly interested in the result of the suit as vendor of Williams.

His mere opinion, also, is permitted to go before the court as evidence.

There are other errors apparent in the record, to which we will simply call the attention of the court.

1st. The decree was taken without any proof as against the infants defendant, that Williams had ever paid one cent for the land,—the memorandum indorsed on the deed from Powell & Rushing to that effect being no part thereof, and not otherwise proved, and not even alleged in the bill to have been in the handwriting of either Powell or Rushing, or to have been signed by either of them.

2d. The lands are not described, either in the levy or *venditioni exponas*, as being in any county in the State; and it does not appear in the marshal's return, that the sale took place at the court-house of the county in which said lands are situated, nor is it averred or shown anywhere in the proof, except in the marshal's deed, in what county said lands are situated.

3d. The decree was rendered without any proof as to the allega-

tions of the purchase by Powell & Rushing under the execution in favor of the Canal Bank, the exhibit (A) not having been filed, or at least, not appearing in the record.

The bill of Williams being filed for the purpose of removing the cloud from his title, formed by the conveyance, made for the benefit of the infant defendants thereto, he should have shown in himself a clear and indisputable legal or equitable title. This has been repeatedly held by this court. The levy and returns of the marshal before referred to, imperfect and incomplete as they are, together with the entire absence of one of the most important muniments of title as to one portion of the land, certainly show that the title sought to be enforced is not of that clear and indisputable sort as is required in a proceeding like this.

The answer of infants by guardian *ad litem*, admits nothing, and calls for the strictest proof, and without such proof it is error to render a decree against them.

The bill filed by these infants, after pointing out the error in the decree against them, shows that they are prepared to make full defence, if they are allowed to avail themselves of their reserved privilege. They aver that their father had ample means, apart from the land conveyed by him for their benefit at the time he so conveyed it, and also when it was sold under said judgments, out of which said judgments could have been satisfied, and that therefore it was not made with a view of hindering and delaying his creditors; that Williams had full notice of the trust resting on the land in their favor, when he purchased from Powell & Rushing; that the land was purchased by them for a price grossly inadequate; that their father was a man of intemperate habits, and incapable of attending to his affairs, and on that account an easy prey to any one who might attempt to circumvent him. If the privilege of infants to be heard after reaching mature age is worth anything and is not a mere mockery, these parties are entitled to an opportunity of rendering, or at least of attempting to render, their defence available, else, in the language of the master of the rolls in the case of *Fountain* v. *Cain,* cited from 1 P. Wms., " that would be, at the same time that the court gave them liberty to show cause, to tie up their hands from showing cause."

It is a fact worthy of consideration that the decree complained

of, depriving these infants of thirty thousand dollars worth of property, was rendered, without any counsel appearing in their behalf. Their father was dead at that time, having answered in *propria persona*, and with seeming indifference as to the result.

Should the court be of opinion that sufficient is shown to entitle the complainants to relief, a question will arise as to the mode of future procedure. It is respectfully suggested that there are two remedies,—either by reopening the original cause, and permitting a new answer to be filed and new defence made, or by treating this as a bill of review, or original bill in the nature of a bill of review, requiring answers from the defendants thereto, and a proceeding to final judgment, as in other cases. The latter course would certainly be warranted by the authorities cited in the first part of this brief, and is perhaps the one to be preferred.

*R. Barnett*, for appellees.

This is a " bill of review." It cannot be deemed a bill of any other character. The prayer of the bill stamps upon it, " a bill of review." Counsel for complainants admit that it is a " bill of review." The defendants have demurred to the bill. The demurrer presents the question, whether such a bill can be maintained in this court, even if preferred under such circumstances as would authorize a review of the decree complained of ? I insist that a bill of review could not be entertained by " the Chancery Court of Issaquena county," of a decree rendered by " the Superior Court of Chancery of the State of Mississippi," however glaring or apparent the error or errors in such decree might be.

1st. Because a bill of review " can only be filed in the court in which the original decree sought to be reviewed was made." *Mercer* v. *Starke*, 1 Smedes & Marshall's Chancery Reports, 479. A bill of review must be heard before the same judge or jurisdiction that gave the decree which is sought to be reviewed. See opinion of Chancellor Buckner, 1 S. & M. Ch. Rep. 485. It will hardly be insisted that " the Chancery Court of Issaquena county" is the same jurisdiction with that of " the Superior Court of Chancery of the State of Mississippi." The general jurisdiction in all matters of equity conferred upon the Chancery Court of Issaquena county by the Act of 11th March, 1856, see 2 Revised Code (1857), 540,

Art. 2, does not, I insist, embrace bills of review. It is admitted that the Chancery Court of Issaquena county would have the right to entertain a bill of review of a decree rendered by itself, but not to a decree rendered by the Superior Court of Chancery. A review of a decree rendered by the same court is within the general jurisdiction of all courts of equity; but a right by one court to review a decree rendered by another court, must be a special power conferred by statute. If the legislature had intended that decrees of the Superior Court of Chancery might be reviewed by the chancery courts, as at present organized, they would have conferred that jurisdiction specially; but they have not done so. Hence this court does not profess the power to review the decree complained of in complainants' bill.

The act organizing a separate Superior Court of Chancery, &c., of March 2d, 1833, to be found in Hutchinson's Digest, 767, 768, provides for a bill of review specially. See sec. 7, p. 768, latter part of the section, where express power is conferred upon the Superior Court of Chancery "to grant bills of review in any judgment that may be rendered on the equity side of the Circuit Court," &c. Such bill of review could only have been filed by express authority of the legislature.

We insist then, that even did the bill of complainants show good cause for a review of the decree complained of, such decree could not, for the reasons before stated, be reviewed by this court.

2d. But if we mistake in this, and this court shall be of opinion that it has jurisdiction of a bill filed to review a decree of the late Superior Court of Chancery, we insist that the bill filed by complainants shows no such cause as ought to induce the court to review the decree complained of.

The bill alleges errors, which, if they exist, are not such as would entitle complainants to have the decree complained of, reviewed by this court. A bill of review can only be brought upon two grounds. 1st. Error in law apparent upon the face of the decree. 2d. Discovery of new matter, which could not have been used at the time of making the decree, in consequence of the party's ignorance that such matter existed. See Story's Equity Pleadings, 320, 321, 322, 323, §§ 403, 404, 405, 406, 407, &c.; 6 Call, 47; 1 H. & Munford, 13; 2 Munford, 305; 2 H. & Munford, 593; 2 Johns. Ch. Reps.

491; 1 Hopkins, 102; see also 3 Daniel's Ch. Practice, 1788, 1789, and notes to pages cited. The first is the only ground relied on by complainants in their bill. They do not pretend that any new matter has been discovered; they rely alone on errors apparent on the face of the decree.

The English practice was to look to the decree itself only, and if no errors existed in it, the review was refused. See Story's Eq. Pl. 323, § 407; also note 1, on p. 324. With us a different practice prevails. The pleadings, as well as the decree, may be looked into; but no court has ever gone so far as to look into the evidence, to see if the cause was well and properly decided. No bill of review can be sustained upon the ground that a fact is stated in the decree as proved, when in truth there was no proof to establish that fact. The error apparent upon the decree must be an error in point of law, arising out of the facts admitted by the pleadings, or recited in the decree itself. See Story's Equity Pleadings, 323, § 407; *Webb et al.* v. *Pell et al.* 3 Paige, 368; *Barnett & Co.* v. *Smith & Co.* 5 Call. 102; see 3 Daniel's Ch. Prac. 1728, note 2.

Complainants' objection to deposition of Rushing, even if it could be properly made under a bill of review, amounts to nothing. He was a competent witness. He had only executed a quitclaim deed to defendant Williams. (See Exhibit F. to bill of *D. O. Williams et al.* v. *George Joor et al.*) Rushing & Powell conveyed to Williams " all the right, title, and interest in them vested by virtue of said executions and sales aforesaid;" nothing more; and had Williams been evicted of the land he would, or shall be evicted hereafter, he will have no remedy against Rushing, on the deed made by Rushing & Powell. The interest of Rushing, if any he had, was in fact against Williams, and Williams might have objected to him as a witness, had he been offered by the defendants, in the suit of *Williams* v. *Joor et al.* Rushing had sold the land by a quitclaim deed only, without warranty, and had received payment for it. He being the feoffee in the deed from George Joor, in trust for his children, would have excluded him as a witness for the defendants in the suit of *Williams* v. *Joor et al.*, but he was certainly a competent witness for Williams, as before stated.

William Rushing, although a trustee in the deed from Joor to his children, had the undoubted right to purchase the land sold by the

marshal under a judgment, the lien of which is stated by complainants themselves (see bill) to have been older by two days than the deed of conveyance from Joor to his children. The judgment of the New Orleans Canal and Banking Company was rendered in the United States Circuit Court on 24th day of November, 1841, against George Joor individually, execution issued thereon, and forthcoming bond taken, with Rushing & Powell as securities. This bond was forfeited 28th March, 1842, and became, of course, a lien on all the property of George Joor from that date. The deed from George Joor to Rushing, as trustee for his children, was executed on 30th day of March, 1842. See Exhibit G. to the bill of *Williams* v. *Joor et al.*

Can it be seriously contended that William Rushing, a surety for Joor for the very debt for which the land was sold under a judgment older than the trust deed, was obliged to stand silently by and see the land of Joor sold at a nominal price to a stranger, and thus pass away from Joor, leaving him (Rushing) liable for the amount of the large judgment against Joor and himself, as Joor's security, simply because he had been reluctantly made a trustee in the deed from Joor to his children, made without question for the purpose of defending his (Joor's) creditors? The principle that a trustee cannot purchase the trust-subject does not apply to a case like this. That principle only applies where the sale is made by the trustee himself under authority of the trust, and because he occupies the anomalous and forbidden position of both vendor and purchaser. No authority can be found, I apprehend, going to the extent that a party in the situation of Rushing is forbidden to purchase. Can it be maintained that Rushing, in making the purchase, became a trustee for the children of Joor? If so, upon what principle? Rushing bought with his own means, not having a dollar in his hands belonging to the children of Joor. He had to buy for his own indemnity, as I have before shown, and with his own private means. Would it not be absurd, as well as unjust, to maintain that he by purchasing with his own money became a trustee for children of Joor? I might elaborate here, but forbear, deeming what I have already said sufficient on the point.

It is shown that Shelby, the administrator of Joor, was present at the taking of the deposition of Rushing.

The guardian *ad litem* (L. V. Dixon), had the undoubted right to consent that the deposition of Rushing might be read. He was satisfied that the presence of Shelby was enough, and that no cross-examination of the witness would have availed anything, especially taken in connection with the answer of George Joor. The guardian *ad litem* may have satisfied himself from other sources, too, that what Rushing deposed to was true. Whilst it is usual, I believe, to give notice of time and place of taking depositions to guardian *ad litem*, it is very unusual for such to attend and cross-examine witnesses; never when such guardian *ad litem* is a mere court officer, and his answer a mere formal one.

But the court will not fail to remember that I discuss these matters, not because it is for a moment conceded that even if the superior Court of Chancery decided the case of *Williams* v. *Joor et al.* wrong, or by reason of improper evidence, that for that reason the bill of complainants can be maintained. The question is not whether the court decided right or wrong, or upon improper evidence, but solely whether upon the face of the decree there is error.

Is it anywhere intimated in complainant's bill, that the evidence upon which the original case was decided is untrue? It is not; and surely, if the case stated in Williams's bill, and as proved by the evidence, is true, the decree of the court is not only right, but just, and in accordance with law. See cases before referred to in note 2 to page 1789 of Daniel's Ch. Practice (vol. 3); *James* v. *Fisk*, 9 Smedes & Marshall, 144..

A memorandum on a deed is always considered as a part of the deed. It was sufficient evidence of the receipt of the purchase-money from Williams by Powell & Rushing. See this principle settled in 1 Cushman, 207, and authorities cited by the counsel for plaintiff in the case mentioned; but the deed itself in the body of it acknowledges the receipt of the purchase-money.

The objection made that "the decree is erroneous," because the lands are not described as lying in any county in this State, is too frivolous to need comment. If the description is not sufficient to designate the land, and the land claimed by complainants has never in fact been sold, they have their remedy, and should resort to their action of ejectment for its recovery; but see *Minor* v. *City of Natchez*, 4 S. & M. 602, and the principles there laid down

touching sales made by marshals, sheriffs, &c. Mere irregularities are no ground for bill of review. See authorities before quoted.

Complainant's bill cannot be sustained as an original bill to set aside a decree for fraud. It is, as we stated in the beginning of our argument, a bill of review, and none other. There is no direct charge of fraud anywhere in the bill, and it is a well-settled principle that fraud must be directly charged,—it can never be presumed or inferred. The only thing squinting at fraud in complainant's bill is that the prices at which the lands were sold "were grossly inadequate, and of themselves evidence of fraud upon the rights of complainants, for which, say complainants, said sales ought to be set aside." Inadequacy of price is never *per se* deemed evidence of fraud; but it will be remembered that the sale here complained of was a judicial sale by a law officer, and after due notice, and after the sale of the property had been more than once postponed because there were no bidders. See returns of executions from United States Circuit Court.

Bill, as a bill of review, would be barred, but for the saving in the decree of *Williams* v. *Joor et al.* of the rights of the infants. The question is, how far this reservation extends? In the case of *Doe ex dem. R. L. Smith* v. *I. A. Bradley et al.* 6 Smedes & Marshall, 485, our High Court says: " A decree against infants foreclosing a mortgage, which is rendered without giving a day after their coming of age, to show cause against the decree, and without appointing a guardian *ad litem* for them, or taking the bill for confessed against them, will not for such irregularities be made void." Again, in same case, " A decree for the sale of mortgaged premises, instead of a technical foreclosure, is binding on an infant, although no day be given to show cause against it." Again, in same case, " An infant defendant can, after he comes of age, only avoid a decree against him by showing errors in the decree; he cannot reinvestigate the subject-matters of the suit, nor can he redeem mortgaged premises which have been sold." The attention of the court is particularly called to the case cited, 6 Smedes & Marshall, 485, and the authorities cited by Chief Justice Sharkey in delivering the opinion of the court in the case, pp. 490, 491, 492, 493. See also *Hargrave* v. *Martin Pleasants & Co.* 6 Smedes & Marshall, 68.

What has been above said in relation to Rushing, applies with even stronger force to defendant Powell, who was in no manner connected with the deed of Frost from George Joor to Rushing for benefit of his children.

HARRIS, J., delivered the opinion of the court.

The plaintiffs in error filed their bill in the Chancery Court of Warren county to set aside a decree rendered against them while infants, at the suit of the said Daniel O. Williams against them and their father George Joor, setting aside a conveyance made to defendant Rushing by said Joor, in trust for his said infant children. The said Rushing, trustee, was not made a party to said proceeding, nor was any decree rendered against him as trustee.

The facts, as they appear by the present bill and exhibits thereto, are as follows: On the 24th day of November, 1841, the New Orleans Canal and Banking Company recovered judgment in the United States Circuit Court at Jackson, Mississippi, against George Joor for $3717.

On this judgment, *fi. fa.* issued, and was levied on personal property, and forthcoming bond given and forfeited, with said Mordecai Powell & William Rushing as his sureties; which bond was forfeited on the 28th day of March, 1842.

The record of this judgment, and the proceedings thereon, although referred to as Exhibit A. in Williams's original bill, it is alleged, are not of file in said case, and nowhere appear in this record. It is stated, however, in Williams's original bill, that execution issued on this forthcoming bond, and was levied on the lands in controversy or part thereof, which were sold by Anderson Miller, marshal of the United States, under a *pluries venditioni exponas*, on the 4th March, 1844, to said Powell & Rushing (the securities on said forthcoming bond) as trustees for the said bank (plaintiff) ($561\frac{8}{100}$ acres), for $2818 89.

On the 23d day of November, 1842, Lambeth & Thompson, in the same court, recovered a judgment against said George Joor for $1825 17 on a note dated 1st March, 1841, and due 12th September, 1841. *Fi. fa.* issued on this judgment on 26th December, 1842, which was levied on five negroes as the property of said George Joor, and forthcoming bond executed with *Mordecai Powell*

as his security.   And this bond was forfeited 1st May, 1843.   On the 8th June, 1843, execution issued on the forthcoming bond against said Joor, which was levied by the United States marshal on other lands not embraced in the levy and sale under the New Orleans Canal and Banking Company execution, but also a part of the lands now in dispute.   This levy was made on the 26th September, 1843, on $312\frac{82}{100}$ acres, and advertised for sale on the 1st Monday in November, 1843, and returned not sold for want of bidders.   On the 5th December, 1843, a *venditioni exponas* issued, under which the marshal sold said land on the 4th March, 1844, to the said Powell & Rushing, *as trustees for plaintiffs' assignees*, for the sum of $100.

This judgment of Lambeth & Thompson was assigned to Payne & Harrison on the 16th February, 1844; and on the same day Payne & Harrison, in writing, authorized the said Powell & Rushing to act as their agents in settling and conducting the execution against Joor and Powell, with directions to sell the property and to buy the same in for Payne & Harrison, and to hold it as trustees for them.   On the 3d June, 1844, an *alias fi. fa.* was issued on this judgment, and *was levied* by the marshal on *six slaves* as the property of said Joor, and returned, " *Stayed, by order of plaintiffs, November 4th, 1844, and negroes delivered to defendant.*"   With this further indorsement thereon: " *The marshal is hereby directed to return this execution not acted on, and the clerk is directed not to issue the execution until further orders.   (Signed by) Mordecai Powell, one of plaintiffs' trustees in this case.*"

It further appears by the statements of said Williams's original bill, that the said Powell & Rushing made the purchase of the lands in dispute at marshal's sale, under a previous understanding with the owners of said judgment, that they were to make said purchase in their own names as trustees for the owners of said judgments, and upon the payment to said owners of the whole amount of these judgments, the said Powell & Rushing should become the absolute owners of the land.   It is further alleged and shown that no deed was executed for a long time after the sale by the said marshal to said Powell & Rushing for said land.   But, on the 16th day of November, 1846, five days before the conveyance by said Powell & Rushing (as Williams alleges in his said bill), upon

*satisfactory proof that said Powell & Rushing had fully paid off plaintiffs' judgments,* the said Circuit Court of the United States ordered the marshal to make them deeds for said land, and refers to Exhibits A. and B. for said deeds.   The said bill further alleges as a fact, that *Powell & Rushing* had *fully paid* said judgments to said owners, and refers to their receipts, as Exhibits C. and E., to his bill; and that the said George Joor had "*no other property* subject to execution besides said land, and the negro named in said deed."   Afterwards, on the 11th day of March, 1848, the said Williams filed an amended bill, in which he says, that instead of saying as he did in his original bill, "that *Powell & Rushing* have fully paid and satisfied both said executions," he "should have stated that *he, Williams, for said Powell & Rushing, has satisfied and paid both said executions.*"   Also, that instead of saying "that there was *no other property* subject to said executions, besides said land and a negro man named in said deed," he should have added, "*to the best of his knowledge and belief.*"

It further appears by said record before us, that on the 30th day of March, 1842, just *two days after* the forfeiture of the forthcoming bond, executed by the said George Joor to the said Powell & Rushing, as his securities, in the case of the New Orleans Canal and Banking Company, the said George Joor executed to the said William Rushing, as trustee for their benefit, a deed of conveyance of the lands in dispute; and that the said William Rushing, as a trustee for complainants, *accepted said trust,* with a full knowledge of the existence of said debt, *and his own* and the said Powell's liability. as securities therefor; which deed of trust was duly recorded on the same day, according to law.   If the said deed was fraudulent, therefore, he was a party to it.

After the payment "*for Powell & Rushing,*" of the judgments which they had agreed to pay before their title to the land, under their agreement, was to become absolute, and after the procuration of the title by order of court, "*upon proof*" that said "*Powell & Rushing had fully paid off said* judgments," and after the execution of the deed of *Powell & Rushing* to said Daniel O. Williams, the said Williams filed the original bill already referred to, setting up this title derived from Powell & Rushing, and his payment "*for them,*" and alleging that the deed from George Joor to William

Rushing, as trustee, for the benefit of those infants, was fraudulent and void, and a cloud upon his title, and praying that it might be set aside and held for nought. Rushing, as already stated, *was* not made a party, although his title as trustee was to be divested by the proceeding.

But George Joor, a drunken imbecile, as alleged in this record, and these infants, *were* made parties. The said George *filed his own answer*, as the record shows, and substantially admits the allegations of the bill, except that he *intended no fraud*. He was either so drunk or so imbecile that he did not remember, that when he signed the deed to his trustee, Rushing, for his children, that he had the six negroes which were subsequently levied on by the plaintiffs on these executions, and released, and *returned to him by their order ;* but is made to say *positively*, that he had no property liable to execution against him, except that embraced in this deed to Rushing for the benefit of his children,—a fact which Williams at first stated in his bill, but afterwards, by his amended bill, *refused to affirm ;* a fact which Rushing refused to state when on the stand as witness, and a fact wholly omitted to be proven, on the hearing of his bill, by Williams, although the most important fact in his case to be established.

The record shows that not only does Rushing, the trustee of these children by voluntary acceptance, take no step for their protection, but in violation of his duty he becomes the agent and trustee of the creditors of George Joor, to have the subject of the trust swept from the beneficiaries, by sale under executions at law, *for his own benefit.*

When it is alleged in these proceedings, and admitted by the demurrer, that there was ample other property, out of which they might and ought to have been satisfied ; and further, that after his purchase and sale of the property to Daniel O. Williams, and after the filing of said Williams's bill, to annul the rights of his infant wards in these lands, instead of making defence, he is the willing witness for complainant Williams, *without any knowledge of the object of the conveyance*, as he states in his deposition, to volunteer his "*opinion*," that it was made to evade the payment of his creditors, he does not offer to prove (nor is he even asked the question), that there was no other property out of which these judgments

might have been satisfied. No explanation is made as to how *he voluntarily became a party* to a fraudulent deed made to *defraud himself*, as security on the forthcoming bond, and to compel him to pay this debt; and there is no other proof of any fraud to sustain said bill.

Upon this state of facts, it is alleged in the present bill, the chancellor rendered a decree in favor of said Williams against the said George Joor and his infant children (these complainants), setting aside the said deed to Rushing for their benefit, and ordering the same to be delivered up to be cancelled as fraudulent and void, saving to the minors six months in which to contest said decree.

This bill is now filed to set aside said decree. The bill, after setting forth the foregoing facts, with full copies of the bill of Williams, and all the exhibits, and proofs, and proceedings therein (except Exhibit A.) and said decree, proceeds to charge that Daniel O. Williams was a purchaser from the said Rushing, trustee for complainants, with full notice, actual as well as constructive, of said deed of trust.

That said Rushing, being trustee for the benefit of complainants, could make no purchase for himself of said land, and the said Williams, being a purchaser from said trustee with full knowledge of the rights of complainants, could occupy no better position than Rushing.

The bill further alleges that the said lands, at the time of the execution of the deed of trust for their benefit, were worth twenty-five or thirty thousand dollars; that their father was cultivating the same, and was in possession of a large number of slaves and other property, and was considered a man of wealth, and had the said Rushing proved faithful to his trust, the said land would have been secured to them ; that their father was a man of intemperate habits, and incapable of attending to his business for three or four years before his death ; that when he conveyed said property, he had ample other property subject to execution ; that the annual value of the said land by way of rent was two thousand dollars at the time of the conveyance to complainant's trustee ; that the sale of said lands, under the circumstances, was a fraud upon the rights of complainants, for which said sale ought to be set aside.

The bill prays that Williams, Rushing & Powell may be made

parties; that the decree in favor of Williams may be set aside; that an account be taken of the amount due on said executions, and of the rents and profits of said lands, &c. &c.; and that, upon a full and fair account, they shall have said lands, or so much thereof, or of their value, as may remain after the payment of said executions, &c., or whatever may be found due them.

To this bill, presenting this state of facts, a demurrer was filed by all the defendants, a general demurrer for Powell & Rushing, and a special demurrer, with answer denying fraud, for Williams; which demurrer was sustained by the court below, and the bill dismissed. And an appeal is now prosecuted here to reverse said decree.

Taking the statements of this bill as true, for the purposes of this demurrer, and it presents a flagrant case of fraud and bad faith on the part of the trustee, Rushing, in the perpetration of which his associates, Powell and Daniel O. Williams, must be regarded as fully implicated.

The principle is now too well settled to be called in question, that on grounds of public policy, independent of all fraud, " a trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it." 1 Story's Equity Jurisdiction, § 322, p. 361.

The principle applies, however innocent the purchase may be in a given case. It is poisonous in its consequences. That it is advantageous to the trustee, or fraudulent, or even injurious to the *cestui que trust,* is not necessary to be shown. It is to guard against the uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule permits the *cestui que trust,* at his own option, to set aside the sale. 1 Story's Eq. Jur. § 322, and cases cited.

The authorities, ancient and modern, are uniform to this point. They are collected and ably reviewed by Chancellor Kent in *Davoue* v. *Fanning et al.* 2 John. Ch. R. 252, in which he concludes his opinion with the reasoning employed by counsel for the appellant in the *York Buildings Company* v. *MacKenzie,* decided in the English House of Lords in 1795, and reported in 8 Brown's P. C. by Tomlin, App. p. 63. This reasoning he gives nearly in the

words of its author, for the reason, it is presumed, that neither in its style or force of argument could it be improved even by his own vigorous pen.

The appellants were an insolvent company, and their estates were sold by order of the Court of Sessions, at a public judicial sale, to satisfy creditors. The course at such sales is to set up the property at a value fixed upon by the court, which is called the *upset price*, and which is founded on information procured by the *common agent* of the court, who has the management of all the outdoor business of the cause. The respondent was the *common agent* in that cause, and he purchased for himself at the *upset price*, no person appearing to bid more, *and the sale* was confirmed by the court; and in the course of eleven years' possession, he had expended large sums for building and improvements. *There was no question as to the fairness and integrity of the purchase.* But the object of the appellant was to set aside the sale, and have the estates sold anew, on the ground that the respondent being the *common agent* in court, in behalf of all parties, to procure information and attend the sale, was *in the nature of a trustee*, and so disabled to purchase.

The reasons of the House of Lords for setting aside the sale are not given; but we are left to infer them from the argument upon which the appeal was founded.

The appellants contended, that the common agent was under a disability to purchase, arising from his office; that the rule was founded in reason and nature, and prevailed wherever any well-regulated administration of justice was known. That the disability rested on the principle which dictated that a person cannot be both judge and party, and serve two masters. That he who is intrusted with the interests of others, cannot be allowed to make the business an object to himself, because, from the frailty of nature, one who has the power will be too readily seized with the inclination to serve his own interest at the expense of those for whom he is intrusted. That the danger of temptation does, out of the mere necessity of the case, work a disqualification, nothing less than incapacity being able to shut the door against temptation when the danger is imminent, and the security against discovery great. That the wise policy of the law had therefore put the sting of disability into the temptation, as a defensive weapon against the strength of the danger

Joor et al. *v.* Williams et al.

which lies in the situation. That the parts which the buyer and seller have to act, stand in direct opposition to each other in point of interest ; *and this conflict of interest* is the rock for shunning which, the disability has attained its force, by making that person, who has the one part intrusted to him, incapable of acting on the other side.

The House of Lords set aside the sale, ordering the purchaser to account for the rents and occupation in the mean time, with a liberal allowance to him for his permanent improvements. This decision certainly carried the doctrine to its full extent, and it may be considered as a high and authoritative sanction given to the reasoning which accompanied the appeal.

That it was in the power, and was the duty, of this trustee to have interposed and enjoined the sale of this property under those executions, when there was ample other property, as alleged in this bill, out of which they might and ought to have been satisfied, cannot be doubted.

As to his *power*, the late case of *Keaton et al.* v. *Miller's Admr.* is conclusive.

And, as to his *duty*, it necessarily resulted from the acceptance of the trust.

He not only did not protect the property thus conveyed to him, in trust for the benefit of these complainants, but he became the agent of the plaintiffs in execution under a contract beneficial to himself, to destroy their right and defeat his own title so held for them.

Williams, with a full knowledge both of his fiduciary character and of this violation of his trust, became a purchaser *from him* of the trust property, and cannot therefore be permitted to occupy any better position than his vendor as a trustee.

Williams alleges, in his bill, that this deed of trust was *fraudulent.* He shows that Rushing was a voluntary party to that deed ; that he assumed Rushing's liability, and actually *paid for* Rushing & Powell, the amount agreed to be paid by them to render *their* title to said land *absolute,* under the agreement between them and the plaintiffs in execution. The whole record shows, on this demurrer, that if there was any fraud in that deed, that Rushing was not only an active participant in it, but that he was the only wit-

ness to it.   If he was a party to such fraud, how can he or his vendee, or any one in privity with him, be permitted to come into a court of equity, not only to assert the fraud, but to claim its interposition to sanctify a speculation made by them out of infant children on that very account?

This point alone would be conclusive of Williams's claim, and shows that *he* can no more be heard in a court of equity than could Rushing himself.

Let the decree below sustaining the demurrer to complainants' bill, and dismissing the same, be reversed, and cause remanded for further proceedings in accordance with this opinion.

SMITH, C. J., concurred.

HANDY, J., dissented as follows:

Being unable to agree with the views of this case taken in the opinion of the majority of the court, I will very briefly state the grounds of my dissent, without entering into an argument in support of them.

1. The judgments of the Canal Bank and of Lambeth & Thompson, were claims against the land sold under them, paramount to the deed executed by Joor for the benefit of his children.   Under these judgments the land was sold, and purchased by Powell & Rushing, upon an agreement with the judgment creditors, that they should have the privilege of paying the judgments, and thereupon become entitled to the land.   At the sale under the judgments, Powell & Rushing acted as trustees and agents for the judgment creditors, and purchased the land for their benefit and security, and entered into the agreement with them above stated.   The primary beneficiaries of the purchase were the creditors under whose executions the land was sold, and who had the right to sell the land in satisfaction of their judgments.   Powell & Rushing were only to become entitled to the land upon their paying the judgments to the creditors; until then they held it merely *as trustees* for the judgment creditors.   Now they never paid the money to the creditors; but Williams came in, and on his own account paid the money *to the creditors*, and became substituted to the agreement which Powell & Rushing had made, but which they never complied with, and by the

failure to do which, they never acquired any fixed and substantial interest in the land. The right to subject the land to the satisfaction of the judgments being paramount, and the land having been sold for their benefit, Williams became entitled to their equity by paying the money directly to them, and the legal title which had been conveyed to Powell & Rushing, *as trustees for the creditors*, was conveyed to him, as though he had made the purchase originally instead of Powell & Rushing, and discharged of any defect in the title arising from the previous connection of Powell & Rushing with the purchase. Williams is entitled to protection, through the paramount claim of the judgment creditors, under whose claim the land had been sold, and to whose equity he succeeded by the payment of the purchase-money to them.

2. The deed for the benefit of Joor's children was *voluntary*, and void *per sè* as to his creditors. Though Williams had notice of its execution, as is alleged in the bill and admitted by the demurrer, yet as his equity was founded on the paramount right of the judgment creditors, he was justified in considering it, as it was in the law, void as to the creditors. He stood in no relation of trustee to the children, and was under no incapacity, by reason of it, to purchase the property; and he had a perfect right, as the creditors had, to treat the deed as void. His substantial right to the purchase was derived from the equity of the judgment creditors, and not from the purchase of the legal title from Powell & Rushing, who merely held the naked legal title, *as trustees*, unsupported by any beneficial or equitable interest or substantial right, until they paid the judgments, which they never did. He occupied a position, through the equity which he derived from the claim of the judgment creditors, which fully entitled him to treat the deed as void, in the same manner as the creditors could do; and though he had notice of the existence of the deed, being a stranger to it, he was not bound by it, and had a perfect right to treat it as void. The deed from Powell & Rushing to him was not a conveyance of any substantial interest in the land which they held, but merely of the naked legal title, which they held as trustees for the benefit of the judgment creditors, and conveyed the legal title fortified by the equity existing in behalf of the judgment creditors. The real purchase of Williams was from the judgment creditors, whose equity

was of a high character; and hence he was not implicated in the violation of trust of Rushing, nor was his title affected by the incompetency of the trustee to acquire a title by purchase in opposition to the interests of his *cestuis que trust.* It was the same in substance and in equity, as if Powell & Rushing, being unable to secure to themselves the benefit of the purchase by paying the money, had released their nominal interest in the land to the plaintiffs in the judgments, and they had conveyed it to Williams.

Upon the merits of the case, as shown by the pleadings, I think that the demurrer to the bill was properly sustained.