Milligan, J.,
delivered the opinion of the court:
This action is brought under the Act 9th May, 1866, (14 Stat. L., p. 44,) extending the jurisdiction of this court, and authorizing it to hear and determine the claim of any paymaster, quartermaster, commissary of subsistence, or other disbursing officer of the United States, or of his administrator or executor, for relief from responsibility on account of losses by capture or otherwise, while in the line of his duty, of government funds, vouchers, records, and papers in his charge, and for which such officer was and is held responsible.
The facts of the case, as ascertained by the court and necessary to its decision, are as follows:
The claimant was appointed and commissioned an assistant paymaster, United States volunteers, on the 23d of March, 1863. On the afternoon of February 22,1864, he drew from the Treasury about the sum of $70,000, for the purpose of paying the troops assigned to him, then operating at or in the neighborhood of Culpepper, Virginia, and Fort Washington, Maryland. He carried the money to a room in this city which had been used by him as an office, and which was the only office he had in the city, then occupied by his son, on the third floor of the dwelling, No. 401 C street, in which the Hon. Isaac Newton then resided. The money was in large bills, none under $20, except some fractional currency in sheets.
The money was drawn in the afternoon, and the claimant intended to start to the field to pay off the troops in Virginia on the 7.30 train on the following morning. During the balance *488 of tbe afternoon and until near midnight be was engaged in cutting tbe sheets of fractional currency and arranging bis money preparatory to an early start on tbe next morning. His son, wbo occupied tbe same room, assisted bim a portion of tbe time. He retired to bed before bis father, wbo deposited bis money in bis paymaster’s trunk furnished bim by tbe Government for tbe transportation of funds, locked it, and placed it at tbe fbot of bis bed where be and bis son slept. While be was undressing, and before bis son bad fallen asleepj a messenger brought bim up a telegram. He unlocked tbe room door and received it, then relocked tbe door and retired to rest.
During tbe night, tbe room was entered by burglars through tbe door, and tbe trunk with all its contents carried out to a stable in rear of tbe lot on which tbe bouse stood, and rifled of its contents.
Neither tbe claimant nor bis son appears to have known anything of tbe robbery until about C o’clock tbe next morning, when tbe claimant immediately went to tbe office of tbe chief of police of Washington City, and through bim obtained tbe services of two detectives to investigate tbe case, and if possible to recover tbe money.
As soon as tbe pay department was open, be reported the loss there, and also at tbe Treasury Department; and in tbe afternoon of tbe same day, tbe case was given in charge of tbe chief detective of tbe War Department by order of tbe Secretary of War. Colonel Baker, chief detective, failing after various efforts to discover tbe robbers, or to recover tbe money, in May, 1864, tbe claimant succeeded in getting tbe case transferred to Colonel Wood, superintendent of tbe Old Capitol Prison, wbo appears to have discovered that tbe robbery had been planned by one Christopher V. Hogan, an employé in tbe secret service of tbe Treasury Department, and that it bad been effected by one Al. Burtis, a professional burglar from New York, assisted by Matthew Kinney and John Dugan. Tbe funds were taken to tbe bouse of one John Murphy, in this city, when a portion of them was given to bim and tbe balance carried to New York, and there distributed to Hogan, Dugan, Kinney, and Burtis.
About $1,800 of tbe money was recovered from Murphy, and some postal currency; tbe amount not shown, found in tbe stable where tbe trunk was rifled; and tbe remainder appears *489 never to have been recovered or tbe robbers brought to justice, although they were arrested and confessed the crime, with all the attendant circumstances of the plot.
On the settlement of the claimant’s accounts as paymaster he stands charged with $68,800, as money stolen from his office, and this suit is brought to obtain a decree directing this sum to be entered in his settlement as a credit on his account.
The second section of the act of May 9,1866, declares:“ That whenever said court shall have ascertained the facts of any such loss to have been without fault or neglect on the part of any such officer, it shall make a decree, setting forth the amount thereof, upon which the proper accounting officers of the Treasury shall allow to such officer the amount so decreed as a credit in the settlement of his accounts.”
The effective words in the act are ufault or neglect,n which are not technical words, and must be taken in their common and popular signification. The former imports “ error or mistake,” and the latter “omission, forbearance to do anything that can be done or that requires to be done.”
But the degree of care and diligence required under this act, in the discharge of the duties of a public office, is a question of more delicacy and difficulty. The office which the claimant held was a public trust, and clothed him with certain rights, and imposed upon him corresponding duties. He was the trusted agent of the- government for a compensation fixed by law, and bound to a degree of care and diligence which a careful, prudent man would require of his agent in a matter of private interest or exercise in his own affairs. His own error or mistake, or omission, or forbearance to discharge all lawful duties imposed by virtue of his office, will not excuse him.
But the law requires no impossibilities, and in this case, as well as’ all others involving diligence, the degree of diligence which, in cases of loss, will excuse the party, and entitle him to the benefit of the act of 1866, must be fixed in the light of the circumstances that surround each case and the nature of the service required. In this case, the duties were to be promptly performed, and under circumstances which did not admit of more care than was actually exercised. The funds were drawn from the Treasury at a late hour in the afternoon, and the claimant.required to leave the city early the next morning to pay off the troops in the field. The fractional currency, about *490 $18,000, was in sheets, and bad to be cnt before it could be used, and the whole, after it was prepared for use, at a late hour in the night, placed in the trunk furnished him by the government for this purpose, and it carefully locked, and placed near his bed in the room where he slept. The door of the room was also locked, and every precaution taken which appears to have been within his reach to prevent loss.
There is manifestly no bad faith or dishonest purpose in the case; and the care and diligence exercised were of a high degree, and such as a careful, cautious, and prudent man would have exercised in the discharge of a high public trust, or in a matter of private interest under like circumstances, and nothing more is required, in our view of the act of Congress under which this action is prosecuted, to entitle the claimant to its benefits.
We hold, therefore, that the money was lost while the petitioner was in the line .of his duty, without any fault or neglect on his part, and that he is entitled to have $68,800 credited on his account, and so order, adjudge, and decree.