WeldoN, J.,
delivered the opinion of the court:
This proceeding was instituted under the act of May 9, 1866 (14 Stat. L., p. 44), extending the jurisdiction of this court, authorizing the court to determine the claim of a dis *528 bursing officer for relief from responsibility on account of losses which may occur to him, in the line of his duty, of funds belonging to the United States, and for which he is held responsible.
The statute provides:
“ That whenever said court shall have ascertained the faets of any such loss to have been without fault or neglect on the part of anjr such officer, i't shall make a decree, setting forth the amount thereof, upon which the proper accounting officers of the Treasury shall allow to such officer the amount so decreed as a credit in the settlement of his accounts.”
The facts as found bj^ the court are in substanee as follows, to wit:
The petitioner, in the month of August, 1896, was attached to the U. S. S. Boston, as paymaster, at Shanghai, China. On August 4 there came into his possession, as paymaster, §27,030 Mexican money, which were placed in seven boxes used by banks in packing silver, six boxes of which contained §4,000 and one §3,030. As the paymaster’s safe on board said ship could only hold §20,000 Mexican money, he applied to the captain for a place of storage for a box containing §4,000, who permitted the box to be stowed under a small desk on the open half-deck just outside the cabin door, which place was under the charge of the cabin orderlies.
Boxes of public monejT had, on several occasions before, been stowed in the same place under the same conditions. The petitioner noticed daily in passing that the box had its customary position and appearance, and his clerk was in the habit of looking at the box every day when he came on deck; but the contents of the box were not examined or verified from the time it was first nailed in the bank and finally opened in the presence of two officers appointed by the captain, at the claimant’s request, after the rumor that the money had disappeared.
On the morning of August 28, 1896, the day after the disappearance of B. Mooney and W. H. Hennessey, seaman and marine, the rumor started among the crew that those men had been concerned in the disappearance of public money; and this was the first intimation that the money was missing. At the request of the paymaster, the captain at once ordered a board to be present at the opening of the box, which took *529 place in the presence of the paymaster, the pay clerk, and the two officers of the board, and only three bags, containing SI, 000 Mexican each, were found in the box. The other SI,000 Mexican, valued at $540.14 in gold, have never been found or recovered.
, Promptly, on discovering the loss, a board of inquiry was appointed, which found the facts substantially as above set forth, and also the following:
The paymaster acquiesced in the assignment of the place allotted for the storage of the boxes. The captain gave orders that the charge of the box was' to be one of the duties of the orderlies. The paymaster knew the general duties of cabin orderlies, in whose charge the box was placed, and did not ask for a special sentry who would not be absent at times. The duties of the orderlies generally were to act as official messengers for the captain, to report the hours and boat times to the officer of the deck, and at night between 9 p. m. and reveille to strike the bell located on the upper deck forward of the chart house, all of which duties frequently called them out of sight of their post. They had no special orders, but carried out these regular duties, the charge of the box being a secondary duty. These were the orders as they understood them.
The captain was frequently absent from the ship at night, his cabin was not locked, and the orderly was at the disposal of the commanding officer pro tem, who performed his regular .duties in the absence of the captain. The sergeants and corporals of the guard had no orders in regard to the box. The orderlies were not posted by them, but relieved one another. The absence of the sergeants and corporals of the guard in making the rounds precluded their looking after the box in the orderlies’ absence, especially when the latter were forward striking the bell at night and who were absent at least two minutes every hour from 9 p. m. until reveille. The box was not sealed or fastened to the deck; it was insecurely nailed and had a split lid; it was moved at times when the deck was scrubbed, and was so weak that when one of the orderlies put his foot on it out of curiosity one-half of the lid lifted up.
When the box was ordered renailed after this, the Jack of *530 the dust who was doing the nailing was stopped by order of the captain on account of the noise, but the box was nailed up by the time that same orderly came on post again. When it became rumored that members of the crew had large amounts of money supposed to have been stolen, the box was carried to the pay office and a hammer and chisel sent for; but while waiting for these the paymaster’s clerk took hold of the corner of the box at the top, and so insecure was the covering that he pulled off half the same.
By taking the money out of the bags and stacking it, room was found for the contents of the box in the safe where the principal part of the money had been stored when taken aboard the ship. The boxes used for carrying the money were not completely iron strapped or sealed, but had been previously used for the same purpose. At no time from the time the box was ffrst nailed up in the bank until it was finally opened at the paymaster’s request after the rumor of the disappearance of the money, were the contents of the box examined or verified.
When the claimant rendered his account for the first quarter of 1897 to the Paymaster-General of the Navy, he claimed credit for said amount of public money lost or stolen without any fault or negligence on his part; but it was disallowed by the Auditor for the Navy in the settlement of the account on May 25, 1897, and he was required by the Treasury Department to refund said amount, which he did under protest on April 16, 1900.
The statute under which this suit is brought is a remedial one, and must be construed liberally; but not to the exclusion or in derogation of that responsibility which a public officer intrusted with the.custody of public money assumes when he enters upon the discharge of his. trust.
The words of the statute are: “Whenever said court shall have ascertained the facts of any such loss to have been without fault or neglect on the part of any such officer,” then a decree shall be entered, the legal effect of which is that in the settlement of his accounts in the Treasury a credit shall bo given to the officer for the amount lost without his fault or neglect. The question of “fault or neglect” is a mixed question of law and fact as affected by the law applicable to the facts and circumstances. The question in this proceeding is not now *531 whether the petitioner lost the money as he alleges, but whether such loss was without his fault or neglect.
A public officer, when he assumes the responsibility of an office — especially the custody of money — undertakes in and by that assumption that he will bring to bear in the discharge of his duties the exercise of that care and diligence which a cautious, prudent, and diligent person applies to his own affairs. His responsibility is not to be measured by the highest possible requirement, but upon a reasonable basis of caution and diligence.
In Malone's case (5 C. Cls. R., 486), in speaking of the offi-' cer, it is said that he is—
“A trusted agent of the Government for a compensation fixed by law, and bound to a degree of care and diligence which a careful, prudent man would require of his agent in a matter of private interest or exercise in his own affairs. * * * But the law requires no impossibilities, and in this case, as well as in all others involving diligence, the degree of diligence which, in cases of loss, will excuse the party and entitle him to the benefit of the act of 1866 must be fixed in the light of the circumstances that surround each case and the nature of the service required.”
It is said in Wharton’s Law of Negligence, second edition, section 290, that receivers of public money are required to employ not merely the diligence of an ordinary person but the diligence “of an intelligent and faithful business man in his specialty — a man sufficiently skillful and judicious to be able to undertake the specialty and employing in undertaking it the diligence which a skillful and judicious expert would in such case employ.”
The doctrine announced by the learned author, founded upon the authorities cited in support thereof, seems to go a little beyond what has been said by this court in the case cited from the 5th volume (supra). Applying the law as thus stated to the facts applicable to the loss, we must determine the question as to whether the claimant has brought himself within the letter or spirit of the statute, which requires that such loss must be without fault or neglect on the part of the officer. The court is of the opinion that the facts as applied to the law do not establish that the loss was without the fault or neglect of the claimant, and therefore a decree to the effect that it was is refused, and the petition is dismissed.