Nott, J.,
delivered tbe opinion of tbe court:
This is a suit brought by a paymaster in tbe Army for relief under tbe Disbursing Officers Act (Rev. Stat., § 1059,1062) in regard to a package of Government funds lost without fault or negligence on bis part, but for which be has been held responsible by tbe Paymaster-General.
*118 The loss occurred on the 25tb June, 1869; the claimant'was ordered to mate good the loss out of his own funds on 13th July, 1871; and he did so on the 20th December, 1871. But this suit for relief was not brought until the 18th April, 1878. llore than sis years, consequently, had elapsed from the time of the loss or from the time when the claimant was held responsible for the loss before the suit was brought; and it presents the question whether the statute of limitations is a bar to the relief given by the disbursing officers act. The point has also been made by the counsel for the defendants that the suit will not he after a disbursing officer has complied with his superior officer’s order and paid over the money or made good the loss.
The primary fact in the case upon which it must stand, if it can stand at all, is that accounts in the Treasury are never closed. In neither the legal nor mercantile sense of the term is an account between the Government and one of its officers ever “finally adjusted”, nor is his official bond ever canceled or surrendered. This practice is general, has been invariable since the organization of the Treasury, and is applicable to all officers as well as to those intrusted with the disbursement of the public funds. Thus, when it was determined in 1872 that judicial salaries were not subject to the deduction of the income-tax, the judges of the Supreme Court, like 'disbursing officers, were able to have their accounts at the Treasury restated, and the new balance which appeared owing to them (that is to say, the money which had been withheld from their salaries) paid over to them. In precisely the same manner, and with precisely the same effect, the Treasury would restate this officer’s account were there a decree to relieve him from this loss; and the credit being given to him in pursuance of the decree, whatever balance might then appear due would be paid to him; The balance would not necessarily be the amount of the decree. It might be augmented by other credits or diminished by new-found debits; but. the item decreed by the court would be allowed in the account, and the balance of the account, whatever it might be, would be paid to the officer.
A second fact constituting a part of the same Treasury system is, that the most stringent measures are provided by law to compel the immediate payment of balances found to be due to the' government. Thus in this case the pay of the claimant might have been stopped. He might have been court-mar- *119 tialecl and dismissed tbe service for refusing to pay over tbe money as ordered; and an action might have been brought upon his bond, wherein he would have been precluded by statute from setting up as a defense the matters onwhichhenowrelies for relief. (Army Keg., 1860, § 1350; Tillou’s Case, 6 Wall., 484.)
Not identical with but somewhat analogous to this proceeding is the statutory provision (Kev. Stat., § 1063) which allows the head of an Executive Department to transmit a claim to this court for adjudication without .the assent of the claimant, and where with no voluntary action on his part the court acquires jurisdiction. In such cases it has been held that the statute of limitations cannot be set up as a bar to the action. (Winnisimmet Company’s Case, 12 C. Cls. R., 319.)
It is manifest that a system so convenient, so effective, and so expedient was in the minds of the lawmakers wdien the statute was framed. The statute was not intended to change or circumscribe the system, but to be auxiliary to it. Oases were occurring wherein such credits should be given to disbursing officers. The Treasury had no means for ascertaining the facts or determining the questions necessarily involved. To hold the officers responsible for losses without fault would be a wrong; to compel the- government to proceed against them and allow them to show their losses in defense would be inconvenient, circuitous, and expensive. Congress, therefore, devised the exceedingly simple and effective remedy of enabling this court to come to the aid of the Treasury by determining in such cases whether a certain item should or should not be credited to an officer in his account. This auxiliary remedy ingrafted upon the system left undisturbed the summary remedies whereby the government could proceed against defaulting officers and secure the immediate collection of balances due prima facie. It at the same time left untrammeled and uncurtailed the flexible system -whereby at the latest moment the accounting officers could charge the disbursing officer with a newly-discovered debit, and deduct it from the very item allowed by a decree of the court. It was not the purpose of Congress, on the one hand, to postpone the collection of balances apparently due to the government, nor, on the other hand, to allow the accounting officers by their promptitude to take away from a disbursing officer the very remedy which Congress gave to him by the statute. Kightly construed, the statute becomes a harmonious part of the system of Treasury accounts, and that system, as *120 we have seen, is one that admits of the rectification of mistakes at any time and the entry of debits or credits in any stage of the proceeding's — a system which no more puts the claimant to his action to recover back this money than it put the judges of the Supreme Court to their action to recover money erroneously charged to them as a tax.
But while it is evident that the proceeding under the statute is an auxiliary remedy of the accounting system, and while it is also clear that, in the administration of the accounting system, an account is always liable to be restated, and in that way always open for correction, it is by no means certain that the right to the remedy will not be barred by the statute of limitations. The language of the statute, Every claim against the United States cognizable by the Court of Claims shall be forever barred ” (Bev. Stat., § 1059), is comprehensive enough to include this class of cases; and the same reasons against unlimited delay exist which would be applicable to an action founded on the same transactions to recover back money had and received. Nevertheless the Supreme Court has expressed a doubt in a recent case (Ciarle’s Case, 96 U. S. 37) whether this proceeding to correct an account is a claim against the United States within the meaning of the statute. “ The petition of plaintiff in this suit does not, in the just sense of the word, set forth a claim against the United States. It sets up a defense to a claim of the United States against theplaintiff,”saystlieSupremeCourt. Anditadds, “The statute, if applicable to this class of cases at all, did not begin to run until ” the claimant was held respon sible for the loss.
If both parties here stood upon an equal footing with respect to the right of appeal, we should deem it to be our duty to consider and decide this question now. But, in view of the fact that the claimant has no right of appeal, we should hardly feel, if we reached a conclusion adverse to him, at liberty to render a judgment that could not be reviewed in the face of the doubt which the appellate court has pointedly expressed. Accordingly, without expressing an opinion upon that point, we decide proforma, for the purposes of an appeal, that the statute of limitations does not bar the claimant’s action.
A decree will be entered in the usual form, directing the proper accounting officers of the Treasury to allow to the claimant as a credit in the settlement of his accounts for funds lost at Bryan, Tex. June 25, 1869, the sum of $500.