THE STATE OF CONNECTICUT EX REL. CHARLES JOHN-
SON ET AL. vs. IRWIN ATCHISON.

Third Judicial District, Bridgeport, October Term, 1926.

WHEELER, C. J., CURTIS, MALTBIE, HAINES AND HINMAN, Js.

Under the Constitution and statutes of this State, a town is a
trustee of its "School Fund," otherwise known as the "Town
Deposit Fund" and, in the use and management thereof, it is
rigidly obligated to act in strict accordance with the express
provisions of the law and with the universal principles govern-
ing the conduct of a fiduciary.

If a deficiency occurs in its School Fund, it is the town itself and
not its officers or agents which, under § 436 of the General
Statutes, must make it good to the State.

A town which borrows its own School Fund upon its unsecured
promissory note violates not only the statutes prescribing the
methods of investing the fund, but also the rule that a trustee
should never occupy a position where his self-interest may
conflict with his duties.

A payment made under mistake, whether of fact or of law, may be
recovered back, provided the payor was under no legal or
moral obligation to make it and the payee has no right in good
conscience to retain it.

If the call or warning of a town meeting leaves no doubt as to its
purport or intent and fairly conveys an understanding of the
particular business to be transacted, it is immaterial that it
is expressed in untechnical or informal language.

In 1878, H became treasurer of the town of Sherman and also its
agent for the School Fund, the principal of which was repre-
sented to him to be $2,261. Thereafter for more than forty years
of service in these capacities he kept no separate account of
the School Fund and he mingled the town funds with his
personal funds in the same bank account, but he never appro-
priated the former to his own use. From time to time he re-
ported the principal of the School Fund to the State Board of
Education in varying amounts—in 1887 as being $2,432, the
sum originally received in 1836 by the town. In 1924, after
he had been succeeded in office by the respondent and after
his irregularities in the management of the School Fund had
been called to his attention by the State Board of Education,
he, being physically and mentally infirm and in a condition
of panic, paid to the respondent the original amount of the
fund under the belief that such was his legal duty. At a sub-

sequent town meeting it was voted to return this money to H and the selectmen were instructed to draw an order upon the respondent therefor, but the respondent refused to honor the order, and, in the present action of mandamus, maintained that the action of the town was illegal. *Held:*

1. That since it was apparent that the original School Fund had not been lost, but merely its identity, and that the town had thus twice received the amount of the fund, the plainest principles of justice required that H be repaid.

2. That the description of the payment made by H as a "loan," in the warning of the town meeting and in the vote there passed, was not sufficiently misleading to invalidate the action taken by the town.

3. That the relator was not required to verify his application or to file a bond, since the action was brought to enforce a public right.

Argued November 10th—decided December 16th, 1926.

APPLICATION for a writ of mandamus to compel the defendant as treasurer of the town of Sherman to honor an order drawn upon him by the selectmen of that town, brought to the Superior Court in Fairfield County where a motion to quash the alternative writ was denied and the issues later tried to the court, *Booth, J.;* judgment rendered that a peremptory writ of mandamus be issued, from which the respondent appealed. *No error.*

*Raymond E. Baldwin,* for the appellant (respondent).

*J. Moss Ives,* with whom, on the brief, was *Thomas A. Keating,* for the appellee (petitioner J. T. Rogers, Administrator).

*Henry C. Wilson* with whom, on the brief, was *William Hanna,* for the appellees (petitioners Charles Johnson, Edward A. Platt and George Woodward).

HAINES, J. Under an Act of Congress approved June 23d, 1836, the town of Sherman in common with other towns of the State, received from the State of

Connecticut $2,432.23 as its portion of a "School Fund" provided by that Act and otherwise known as "Town Deposit Fund." The money was turned over to the town as a trust fund only, and the legislature of this State by statute provided in detail how it should be maintained and used. Being a trust fund it at once became and has since remained the legal duty of the town and its agents to preserve, hold, invest and use the fund strictly in accordance with these statutory provisions, and in analogy to the care of the original School Fund. "The preservation of that fund inviolate was specially guarded in the Constitution (Article 8, § 2) which declares that it shall 'remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public, or common schools throughout the State, and for the equal benefit of all the people thereof,' and that 'no law shall ever be made, authorizing said fund to be diverted to any other use than the encouragement and support of public, or common schools, among the several school societies, as justice and equity shall require.' " *State* v. *Kilburn,* 81 Conn. 9, 12, 69 Atl. 1028.

The history of this Town Deposit Fund in the town of Sherman, so far as it relates to the present controversy, dates from 1878 when one Hawley became town treasurer and 1882 when he became agent for the Town Deposit Fund. When Hawley became treasurer in 1878 the fund was represented to him as consisting of six loans to individuals amounting to $914, and loans to the town of Sherman amounting to $1,347.28, a total of $2,261.28. Between 1878 and 1882 three of the individual notes were paid, and the money—$475—came into his hands. In the ten years ensuing the remaining individual notes, amounting to $439, were paid, and he received the money from two of them while the town of Sherman took the land on which the third

was secured by mortgage. Hawley turned the cash so received over to the town. From 1892 no record or written account of either the principal or interest of the fund was kept by Hawley. The finding further discloses that Hawley, during the whole period of this service for more than forty years, kept the town fund and his personal fund mingled in the same bank account. He did not keep a separate account of this fund, although it appears that he never appropriated any of these funds to his own use.

In 1887 he reported the fund in behalf of the town to the secretary of the State Board of Education as $2,432.23. This was the amount of the original fund, and whatever may have been the condition of the fund in his hands at that time, the town must be held responsible for that sum, so in effect alleged to be on hand. It is not important in this connection, that in 1881 and 1882 the town report shows an item of $811 interest in this fund, and that the item disappeared from the report without explanation the following year; nor that $144 per year was reecived for several years; nor that the same report showed only $1,247.28 in the Town Deposit Fund in 1887; nor that the amount reported to the State Board of Education in 1897 was but $2,261.28; nor that only $1,786.28 was reported to the State Board of Education in 1908. These facts in no way change the responsibility of the town to the State for the full amount of the original fund. These were in effect matters of bookkeeping between the town and its agent. There is an item of $170.95, said to belong to the fund, which was unaccounted for when Hawley became the agent of the school fund, and this apparent deficit occurred during the administration of his predecessor in office. It is fair to assume, however, that when Hawley, as agent for the town, reported the fund intact in 1887, this item

of $170.95 had been in some way accounted for or made good. At any rate, the statement of 1887, that the fund was then intact, must be assumed to be correct in the absence of any evidence to the contrary.

Coming to 1922–1924, when the respondent was made town treasurer and agent of the Town Deposit Fund, respectively, in succession to Hawley: The attention of the State authorities having been brought to the matter, notice was sent to Hawley of his dereliction, and he then turned over to the respondent from his own personal funds, when infirm, mentally and physically, and in a condition of panic, and in the belief that he was in duty bound to do so, an amount equal to the whole fund as originally deposited with the town, namely, $2,432.23. The finding states that on May 12th, 1924, the respondent was appointed by the town as agent of its Town Deposit Fund "to receive the sum of $2,432.23."

The management of the fund was not in accordance with statutory requirements. These have remained from the first substantially unchanged, and are, in brief, that the fund should remain on deposit with the town on the terms hereinafter specified. The town is required to keep this money in trust for the State and account for the same when called for; and until called for the entire income thereof is appropriated for the support of the public schools of the town. The treasurer of the town was to have the custody of the fund and be the treasurer thereof; he was required to keep separate accounts of the fund and at each annual town meeting to present an account showing the amount of the fund, how it was invested, the amount of the income, to whom the income was paid and for what it was paid, and the balance remaining in the treasury; this account was to be recorded and kept on file by the town clerk; no payments could be

made from the fund except upon orders drawn by the agent of the fund, and these orders were required to specify whether they were to be paid from the principal or the income of the fund. Immediately upon his appointment it became the duty of the town agent to execute a bond to the town, with surety, to the acceptance of the selectmen, for the faithful execution of his office. It was also made the duty of the town treasurer to report to the comptroller of the State any illegal or improper management or application of the income of the fund as soon as it came to his attention, and his failure in this regard subjected him to a penalty of $20 for every week of such neglect. It was the further duty of the agent of this Town Deposit Fund to keep the fund invested by lending it on notes payable to the town, which notes must be secured by mortgage of real estate in value double the amount loaned, and upon payment of any such loan, to release the mortgages, when he could deposit the proceeds at interest in any bank or trust company incorporated under the laws of this State. The statute further provided that the town could authorize the manager of the fund to invest that fund, or any part of it, in the stock of any bank in this State, in the bonds or securities of any town, city or borough of this State, or in the bonds, loans or securities of this State or of the United States. There is a further provision which has much significance in the present case, touching the responsibility for the maintenance of this fund. "Each town shall make good any deficiency which may occur in such fund, and on failure to make such deficiency good within one year after it shall occur, shall forfeit to the State a sum equal to the amount thereof." General Statutes, §§ 430, 432, 433, 434, 435, 436.

It thus appears that the town of Sherman has never owned this money, but has always been and now is,

simply a trustee in possession of it. As such trustee it assumed, by accepting the money, all the duties of careful and accurate handling which rests upon a trustee. It is not privileged to handle it, invest it, or use it, in any way it may choose, but must act in strict accord with the requirements imposed upon it by law. As will be seen from the statutory provisions last cited, the ultimate responsibility for the fund has always rested upon the town, and upon the continuance for a year of any failure to observe the law, the town is subject to a forfeiture to the State. The importance of a strict adherence to the legal obligations resting upon towns which have received school moneys under the provisions referred to, cannot be too strongly emphasized. The finding of the facts in this case has not been attacked, and they will now be considered in the light of the foregoing legal statement of the situation.

It is clear that the town treasurer and agent of the Town Deposit Fund, is acting in every respect as the agent of the town. Being responsible to the town as its agent, Hawley should have been required to give a bond to the town to ensure the proper performance of his duties. It does not appear from the finding whether this was done. So far as the State is concerned, the responsibility rested at all times upon the town, and if all or any part of the fund were lost, it was the town and not the town agent who must answer to the State. The failure to keep this money in a separate fund with a separate account, the failure to invest or make payments as required by law, and all deviations from the statutory requirements, constitute breaches of the trust.

The finding shows that in March, 1925, at a town meeting, the selectmen were given authority to borrow the entire fund from the present respondent, town agent, and to give the town note therefor. This vio-

lates the statutory provision as to the investment of the fund. As already pointed out, when the town agent lends the money of the fund upon notes, these notes must be payable to the town and must be secured by mortgage upon real estate in value double the amount of the loan. The action of the town meeting, therefore, could confer no authority upon the town agent to loan this money upon the unsecured promissory note of the town.

The town can also authorize the town agent to invest the fund "in the stock of any bank in this State, in the bonds or securities of any town, city or borough in this State, or in the bonds, loans or securities of this State or of the United States." It will be noted that the money can be loaned directly to the State or to the United States, but the word "loan" is not used in connection with towns, cities or boroughs, though "bonds or securities" of the latter may be bought by the agent for investment.

Not only so, but to permit the town, which is the trustee of the money, to borrow the very money of which it is trustee, violates a cardinal rule of the law of trusts. By such act, the town puts itself in an equivocal position and under conflicting obligations, where its self-interest may conflict with its duties as trustee. In a suit to recover the trust money it would be both plaintiff and defendant. *Hinsey* v. *Supreme Lodge K. P.*, 138 Ill. App. 248; *Joor* v. *Williams*, 38 Miss. 546. The trustee cannot lawfully borrow the trust fund, but the title and beneficial interest must be kept separate. *Jones' Estate*, 10 N. Y. St. Rep. 176, 181; *Axtell* v. *Coons*, 82 Fla. 158, 163, 89 So. 419. Having received the sum once from the State, the town now received again the same amount which its agent had received from Hawley. It has thus received altogether $4,864.46 in cash. The ultimate question

presented by this case is, whether the amount received from its former agent should now be repaid. Clearly the town has no right to enrichment. If its duly constituted agent failed to keep a proper account, or make proper investments, and so destroyed the identity of the fund, the town cannot escape its own responsibility. Hawley did not appropriate any of these moneys to his own use. In the absence of any facts to the contrary, the law presumes that neither he nor his predecessor diverted these funds to other than town uses. If the town had taken a bond from its agent, as required by the statute to which we referred, it could have proceeded against him for any loss which it could prove it had suffered by his acts, but the finding does not show that the town has ever lost anything by the acts of Hawley. By far the larger part of the fund has been traced directly into the treasury of the town. If as a matter of fact the town and Hawley did not receive the $170.95, yet the town obviously had no claim upon Hawley for that amount; its claim, if any, was upon his predecessor. Nor can it be successfully maintained that the town acquired a right to retain the money paid by Hawley to the town's agent upon the ground that, knowing all the facts, he made a voluntary payment. It is true he knew the facts, but that he was under a mistaken notion as to the legal aspects of the situation, is equally clear. Hawley's payment was neither a gift nor a voluntary officious payment to the town. He was under the mistaken idea that he was indebted to the town, when as a matter of fact he was not; for the town had already received all the money which had come to him. The respondent urges that Hawley, with his knowledge of the facts, "believed, properly, that he was obligated to account for the loss of the fund." The fundamental difficulty with this claim is, that the fund

was not lost, but only its identity.  As we have seen, the facts and legal presumptions lead to the conclusion that the town had had the entire fund before Hawley, in his bewilderment and fear, paid the same amount again to the town's agent.  On the plainest principles of justice, the town was in duty bound to return the money and cannot now show legal or moral justification for its enrichment in the sum of $2,432.23.

After the matter of Hawley's payment had been before the voters of the town of Sherman in two or three town meetings, it finally came before such a meeting on August 19th, 1924, when it was voted to return the "loan," and the selectmen were instructed to draw an order on the treasurer for the amount "to pay the William F. Hawley loan."  The warning of this meeting referred to this sum as having been "loaned" by Hawley to the town of Sherman.  The respondent questions the legality of both the warning and the vote; the former on the ground that to speak of it as "loan" was improper and misleading to the voters and did not fairly apprise them of the real purpose of the meeting, and the latter as being in effect a gift to Hawley and not a payment required by law.

As to the warning:  Literal accuracy is not required in a warning, and the word "loan" is one of elastic meaning, and in any event, the real object for which the meeting was called was not left in doubt, and it was sufficient to call the attention of the voters to the particular business to be transacted at the meeting. We fail to see how the voters could have been misled by the wording of the warning.  The voters could not have failed to understand what was fairly intended to be the business of the meeting.  *Bull* v. *Warren,* 36 Conn. 83, 85; *Bartlett* v. *Kinsley,* 15 Conn. 327, 332; *South School District* v. *Blakeslee,* 13 Conn. 227, 234.

The vote passed indicates that the purpose of the

meeting as stated in the warning was in fact carried out, and though expressed in untechnical and informal language, can leave no doubt as to its purport and intent.

An order was drawn in pursuance of the vote, but payment has been refused by the respondent, whose reasons are set forth in the return to the present application for a mandamus. One of the reasons assigned by the respondent in the motion to quash was the failure of the relator to verify his application and file a bond. The application is brought to enforce a mandate of the legal voters of the town of Sherman. It is brought to compel the town treasurer to pay certain funds in his hands which he claims are public funds. The right of the voters to make this payment being conceded, it follows that this mandamus was brought to enforce a legal public right. It is not a private right and no verification or bond was required.

The claim that the order made by the town for the return of this money was illegal, is based upon the proposition that the town was making a gift to Hawley. If this was so, the conclusion was sound, but as we have seen, it was the duty of the town to preserve this fund intact. This duty was performed by Hawley personally under the mistaken belief that he was personally liable for the full amount of the fund. The town has been enriched by this mistaken action of Hawley, and the obligation to return the money is founded upon the clearest principles of both justice and law. Its retention would be "against good conscience."

Long ago this court said: "When money is paid by one, under a mistake of his rights and his duty, and which he was under no legal or moral obligation to pay, and which the recipient has no right in good conscience to retain, it may be recovered back, in an action of *indebitatus assumpsit,* whether such mistake be one

of law or fact; and this we insist, may be done, both upon the principles of Christian morals and the common law." *Northrop* v. *Graves,* 19 Conn. 548, 554, cited in *Mansfield* v. *Lynch,* 59 Conn. 320, 327, 22 Atl. 313; *Bristol* v. *New Britain,* 71 Conn. 201, 206, 41 Atl. 548; *Remington Arms U. M. C. Co.* v. *Feeney Tool Co.,* 97 Conn. 129, 131, 115 Atl. 629; *United States* v. *Barlow,* 132 U. S. 271, 282, 10 Sup. Ct. 77. Though the authorities are in conflict as to the right to recover back moneys paid under a mistake of law, this is the Connecticut rule and it is a sound and just one. The order was therefore one which the law made it the duty of the town to draw.

The motion to quash was properly overruled by the trial court and the final judgment for the relator was correct.

There is no error.

In this opinion the other judges concurred.