**TOWN OF HAMDEN v. AMERICAN SURETY CO. OF NEW YORK.**

No. 3576.

District Court, D. Connecticut.

Jan. 23, 1935.

the liability of a custodian of public funds in Connecticut: Is the liability of such a custodian that ordinarily attaching to a bailee for hire? Or is he liable as an insurer, irrespective of fault or negligence, for the safe-keeping of the public funds in his care?

Cases dealing with this subject show to a remarkable degree the influence of the outstandingly leading case on the subject. United States v. Prescott, 3 How. 578, 586, 588, 11 L. Ed. 734. The doctrine of this case has been repeatedly applied by the Supreme Court of the United States and the federal courts generally to federal custodians. And a substantial preponderance of state jurisdictions have followed this authority or attempted to apply its doctrine. A respectable number of state jurisdictions, however, have held that in the absence of statute or of unqualified language in the bond undertaking to pay over public moneys received, *without exception,* the liability of a public custodian is no more than that of a bailee for hire. This conflict of authority is sketched in the text-writers. Stearns on Suretyship (3d Ed.) § 167; Brandt on Suretyship, § 638.

Much of the confusion on this subject, I am convinced, arises from a misconception of the precise holding of the Prescott Case. There, the bond on which the action was brought guaranteed that the principal would faithfully discharge the duties of receiver of public moneys, at Chicago, "according to the laws of the United States; * * * and shall well, truly, and faithfully, keep safely, without loaning or using, all the public moneys collected by him," and pay over the same on proper order. Thus, it will be observed, the bond, in express language, undertook that the principal would "keep safely" and pay over. The court said: "The condition of the bond has been broken, as the defendant, Prescott, failed to pay over the money received by him, when required to do so. * * *" And the question was whether his breach of the bond was excused by a theft of the funds. To be sure, the court held that theft was no excuse. But the extent and ground for this holding has been, I think, much misunderstood. Thus, the court said: "This is not a case of bailment, and, consequently, the law of bailment does not apply to it. The liability of the defendant, Prescott, arises out of his official bond, and principles which are founded upon public policy." This language has been much quot-

F. Raymond Rochford and Edwin A. Clark, both of New Haven, Conn., for plaintiff.

Cummings & Lockwood, of Stamford, Conn., for defendant.

HINCKS, District Judge.

This is an action brought by the town of Hamden against the surety on the official bond of its town treasurer for the loss, resulting from the failure of the Hamden Bank & Trust Company, of town funds deposited by defendant's principal in said bank. Underlying the specific points raised by this demurrer to the complaint is the question of law relating to the extent of

736

ed in support of the doctrine that custodians of public funds are not bailees, and that their liability for the funds entrusted to them is that of an insurer. To me, the language conveys no such meaning. When the learned justice said, "This is not a case of bailment," he did not mean to say that Prescott was not a bailee. He meant only that the "case" then before the court was not one on the contract of bailment, but rather was an action for the breach of an express contract, namely, the official bond. And so, for the purposes of that case, it was said that Prescott's liability "arises out of his official bond" and the ordinary "law of bailment does not apply to it." Later on in its opinion the court says: "The objection to this defence [of theft] is, that it is not within the condition of the bond; *and this would seem to be conclusive.*" Surely that observation indicates that the true ground for the decision is solely the breach of an express contract as contained in the bond. And later still, when the court said, "The obligation to keep safely the public money is absolute," etc., it meant that the "obligation" undertaken in the bond was "absolute." For he concludes that observation by saying, "Nothing but the payment of it, when required, can *discharge the bond.*" And still later it was observed that: "As every depositary receives the office with a full knowledge of its responsibilities, he cannot, in case of loss, complain of hardship. *He must stand by his bond,* and meet the hazards which he voluntarily incurs." And the answer to the question certified was that the principal and his surety "are not *discharged from the bond,* by a felonious stealing of the money," etc. Nowhere was it held or even intimated that a loss by theft without negligence would have constituted a breach of official duty, in the absence of any statute or of an express agreement imposing an unqualified obligation to pay over. The opinion, to be sure, concludes with some observations on "public policy," to which I shall recur after comment on some of the later decisions of the Supreme Court on the general subject-matter.

In the later case of Boyden v. U. S., 13 Wall. 17, 18, 20 L. Ed. 527, again the action was brought upon a receiver's bond, but the condition of that bond was simply that the principal "faithfully executed and discharged all the duties of his said office according to law." But the court observes that: "The acts of Congress respecting re-ceivers made it their duty to pay the public money received by them when ordered by the Treasury Department, and that department, by its general orders of 1854, required payment to be made before this suit was brought. No exception was made, no contingency was contemplated. The bond, therefore, was an absolute obligation to pay the money, and differing not at all, in legal effect, from the bond in Prescott's Case." It was, accordingly, held as against the surety that robbery was no defense. And that the holding was based solely upon the statutory law, which was incorporated into the bond by reference, was indicated, it seems to me, beyond dispute by the following language: "The duty of a receiver, virtute officii, is to bring to the discharge of his trust that prudence, caution, and attention which careful men usually bring to the conduct of their own affairs. He is to pay over the money in his hands as required by law, but he is not an insurer. He may, however, make himself an insurer by express contract, and this he does when he binds himself in a penal bond to perform the duties of his office without exception. There is an established difference between a duty created merely by law and one to which is added the obligation of an express undertaking."

In United States v. Thomas, 15 Wall. 337, 342, 21 L. Ed. 89, the bond was similar to that involved in the Prescott Case, but the defense of seizure of the public money by the public enemy was sustained. Justice Bradley, in his opinion, says: "The general rule of official obligation, as imposed by law, is that the officer shall perform the duties of his office honestly, faithfully, and to the best of his ability. This is the substance of all official oaths. In ordinary cases, to expect more than this would deter upright and responsible men from taking office. This is substantially the rule by which the common law measures the responsibility of those whose official duties require them to have the custody of property, public or private. If in any case a more stringent obligation is desirable, it must be prescribed by statute or exacted by express stipulation." And again: "These provisions show that it is the manifest policy of the law to hold all collectors, receivers, and depositaries of the public money to a very strict accountability. The legislative anxiety on the subject culminates in requiring them to enter into bond with sufficient sureties for the performance of their duties, and in imposing

criminal sanctions for the unauthorized use of the moneys. Whatever duty can be inferred from this course of legislation is justly exacted from the officers. No ordinary excuse can be allowed for the non-production of the money committed to their hands. Still they are nothing but bailees. To call them anything else, when they are expressly forbidden to touch or use the public money except as directed, would be an abuse of terms. But they are special bailees, subject to special obligations. It is evident that the ordinary law of bailment cannot be invoked to determine the degree of their responsibility. This is placed on a new basis. To the extent of the amount of their official bonds, it is fixed by special contract; and the policy of the law as to their general responsibility for amounts not covered by such bonds may be fairly presumed to be the same."

The decision, to be sure, did not hold that the liability of the federal official involved was that only of a bailee for hire; for the defense here held sufficient was one available even to an insurer. The reasoning of the decision, however, shows that in so far as the liability of a federal official exceeds that of any ordinary bailee, his liability flows from his bond and the underlying federal statute.

This construction of the Thomas Case is confirmed by Smythe v. United States, 188 U. S. 156, 23 S. Ct. 279, 283, 47 L. Ed. 425. There it was held that the loss of public funds, even without negligence, by fire (without lightning), was no defense to an action on the custodian's bond; the custodian there being the superintendent of the mint at New Orleans. The court said: " * * * the obligations of a public officer, who received public moneys under a bond conditioned that he would discharge his duties according to law, and safely keep such moneys as came to his hands, by virtue of his office, are not to be determined by the principles of the law of bailment, but by the special contract evidenced by his bond. * * *" And Smythe v. United States (1902) is the last word of the Supreme Court on the subject.

To be sure, in the Prescott Case, the opinion of the court concludes with these observations: "Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands.

Any relaxation of this condition would open a door to frauds, which might be practised with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs, so as to establish his loss, without laches on his part. Let such a principle be applied to our postmasters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public? No such principle has been recognised or admitted as a legal defence."

Some courts have supposed that this language indicated that the court had found a public policy which operated to enlarge, as against public custodians generally, irrespective of the source of their authority, the common-law liability of a bailee for hire. I think, however, an effect so sweeping cannot justly be attributed to this language. This is so for two reasons:

1. In the first place, the language just quoted shows that the court was commenting upon a public policy governing the construction of an official bond as distinguished from a policy defining and enlarging the duties and liabilities of public office; for in the passage quoted, the court deprecates "any relaxation *of this condition.*" Clearly the court was speaking of the condition of the bond that the principal "should keep safely" the public funds. And the passage as a whole meant only that public policy furnished an additional reason for strictly construing the unqualified undertaking in an official bond, so that a "loss, without laches" would not be "admitted as a legal defence" to an action on the bond.

2. In the second place, the facts of the Prescott Case, as well as the language of the opinion, were concerned only with *federal* custodians. Its doctrine, therefore, must be appraised in the light of the federal administrative system, which, as we shall see, differs substantially from that of the state of Connecticut.

The congressional policy relating to the custody of public funds is reflected in the statutes relative to the oaths and bonds of federal officials. Thus government employees handling the public funds and many public officials in their oath of office are required to swear that they will "account for and pay over" public moneys coming into their control. 5 USCA § 365. See, also, 5 USCA § 369, whereunder the Postmaster General has prescribed "Form 1117" for "bond of assistant postmaster, employee or

city letter carrier" containing an express undertaking not only to "faithfully discharge all duties" but also to "account for, deliver, and pay over" all public moneys. See, also, 26 USCA § 15.

Moreover, under the federal system, although "all public officers of whatsoever character, are required to keep safely, without loaning, using, depositing in banks * * * all the public money collected by them, or otherwise at any time placed in their possession and custody" (31 USCA § 521), at the same time the federal law affirmatively requires every disbursing officer (31 USCA § 492), and indeed "every person who shall have moneys of the United States in his hands or possession" (31 USCA § 495), to deposit the same with or pay the same to "the Treasurer or a depositary of the United States"; the same to be designated in conformity with 31 USCA § 476. This latter statute, together with 12 USCA §§ 391 and 392, to which it refers, authorizes the Secretary of the Treasury to designate any of the Federal Reserve Banks as depositories and fiscal agents of the United States. And as such depositories, they may be required to give security for the public funds received. 12 USCA § 90. It thus is inherent in the federal system that federal funds coming into the hands of a receiving officer, when once deposited with a duly designated depository of the United States, are in effect in the treasury of the United States and hence no longer in the possession or custody of that receiving officer. See Branch v. U. S., 100 U. S. 673, 25 L. Ed. 759. And the same situation exists with reference to public funds on deposit with a federal depository awaiting disbursement by an official disbursing officer. Thus, in the ordinary case no question can arise as to the liability of a federal receiver of public moneys or of a federal disbursing officer, for funds deposited with a duly designated depository.

Moreover, the rigor of the Prescott doctrine in effect is much mitigated by another feature of the federal system. Thus, by the Judicial Code, § 145 (3) and § 147, 28 USCA § 250, subd. (3), and § 253, the Court of Claims has jurisdiction to extend to disbursing officers of the United States and other specified officials relief from responsibility for losses found to have occurred without fault or negligence. Relief accordingly has been afforded to federal officers for a loss resulting from the failure of a bank, duly designated as a depository, in which he had in good faith made a deposit of public funds, Hobbs v. U. S., 17 Ct. Cl. 189; for losses from thefts, Howell v. U. S., 7 Ct. Cl. 512, and Glenn v. U. S., 4 Ct. Cl. 501; for loss from a burglary, Malone's Case, 5 Ct. Cl. 486; to loss by robbery, Broadhead v. U. S., 19 Ct. Cl. 125; to loss by accident, Smith's Case, 14 Ct. Cl. 114; and to loss by fire, Hoyle v. U. S., 21 Ct. Cl. 300.

The observations relating to public policy contained in the decisions of the Supreme Court in this line of cases should be read against this background of the federal administrative system. Thus viewed, the public policy there recognized was primarily the policy which Congress had formulated into statute law whereby federal officials charged with the custody of public moneys were affirmatively charged with the unqualified duty to pay over, and were bonded accordingly. The policy of these statutes and the unqualified undertakings of official bonds given in conformity therewith, the Supreme Court has indeed declined to relax. But on the other hand, the Supreme Court has intimated neither that the congressional policy which it has thus approved and enforced with respect to the federal administrative system controls the policy of any state with respect to the subject-matter, nor that the common law of the land is such that under principles of general jurisprudence, unaided by any statutory law, a custodian of the public funds of a state or of a subdivision thereof is under a more rigorous liability than attaches to the ordinary bailee for hire.

Indeed, the liability of a state official, as well as the construction of his official bond, is a matter of local law as distinguished from one of general jurisprudence. Bassinger v. U. S. Fidelity & Guaranty Co. (C. C. A.) 58 F.(2d) 573, certiorari denied 287 U. S. 622, 53 S. Ct. 21, 77 L. Ed. 540. Necessarily the liability of such an official will depend on state statutes, if such exist; and in the absence of statute, on the common law of the state which in large measure must be deduced from the administrative system of the state.

Indeed, this underlying principle that the liability of a state official depends upon the local law is the source of much of the confusion on the subject-matter. For the many variations in the administrative systems of the several states necessarily lead to different conclusions as to their respective policies; in some states, as in the federal

government, the statutory structure of administration is such as to compel the conclusion that the common-law liability of a public custodian has been impliedly modified; in others no such conclusion is justified. Thus in New York, in the case of Tillinghast v. Merrill, 151 N. Y. 135, 45 N. E. 375, 34 L. R. A. 678, 56 Am. St. Rep. 612, the court in considering the liability of town supervisor found him under a statutory duty "to pay over" to his successor" all school moneys received. This statute the court construed to constitute the supervisor a debtor for public moneys coming into his hands, although, to be sure, it was observed that the statute contained no "explicit declaration of legislative intent" to that effect. Similarly an early Massachusetts case, Inhabitants of Hancock v. Hazzard, 12 Cush. 112, 59 Am. Dec. 171, held a tax collector under the state law to be a debtor for the public moneys. This conclusion was predicated upon the case of Inhabitants of Colerain v. Bell, 9 Metc. (Mass.) 499, wherein a tax collector was held liable for uncollected taxes from taxpayers without ability to pay because he had "neglected" to commit the delinquents to prison. Such authorities, in that they are based upon the peculiarities of local law elsewhere, are of little aid in ascertaining the law of Connecticut. They may be contrasted with Walker v. British Guarantee Association, 18 Q. B. 277, 118 Eng. Reprints 104, wherein Lord Campbell held inapplicable to the loss by robbery of a treasurer of a benefit building society an English statute which seemed explicitly to constitute the treasurer a debtor for all funds received. Of the American authorities, the opinion in Inhabitants of Cumberland County v. Pennell, 69 Me. 357, 31 Am. Rep. 284, subjecting a public official only to the common-law liability of a bailee for hire, seems the most nearly in point in that it discloses an administrative background much resembling that of Connecticut.

In Connecticut we find no statute imposing an unqualified obligation on custodians of public funds to pay over the same. The duties of such custodians in the General Statutes are sketched in barest outline. In section 17 of article 4 of the State Constitution it is provided that the treasurer "shall receive all monies belonging to the State, and disburse the same only as he may be directed by law." And chapter 4 of title 2 (section 75 et seq., Gen. St. Conn. 1930) outlines his duties and powers. The duties of the county treasurer are outlined in section 205. The office of town treasurer is an elective office (section 265); his duties are set forth in section 356; and his additional duties as custodian of the town deposit fund are stated in sections 440 and 442. The form of oath and bond for each of these officers is merely that the incumbent "shall faithfully perform all the duties of his said office." Sections 75, 92, 220, and 441. With respect to town treasurers, to be sure, it is, in section 355, provided that the form of bond shall be that fixed by the tax commissioner of the state, but it appears from the complaint herein that the form thus prescribed by the tax commissioner is as above stated.

Whereas under the federal system (see quotations from the Prescott Case, supra), and also in Massachusetts, if one may judge from the opinion in Hancock v. Hazzard, supra, a public official is free to decline office and thus save himself from the rigors of official responsibility, the spirit of the common law is otherwise. Edwards v. U. S., 103 U. S. 471, 26 L. Ed. 314. That Connecticut in this respect has adopted the common law is evidenced by Gen. St. 1930, § 293, prescribing a penalty for any one refusing to accept a town office to which he has been elected.

Under the state administrative system, as outlined in the General Statutes, there was no provision for the official designation of depositories for state or local funds, at least prior to a statute enacted in 1933 (Gen. St. Supp. Conn. 1933, § 75b), after the institution of this litigation. That is not to say, however, that a public custodian, depositing public funds in a bank, thereby commits a breach of his official duty and assumes absolute liability for loss resulting from the failure of the bank. Gen. St. 1930, § 512, the text of which may be carried in a footnote,[1] shows clearly that it

1 "Sec. 512. *Deposit of public money and trust funds.* Any public official of the state or of any county, municipality or school district is authorized to deposit any funds or moneys in his hands belonging to the state or to such county, municipality or district, or held by him as such official or as a trustee, in and with any national or state bank or trust company in this state; provided such deposits shall only be made in his name as such official or trustee or in the name of the state, county, municipality or school district to which the money belongs, and that in no case

was within[1] the legislative contemplation that public custodians would avail themselves freely of the advantages, both of safety and convenience, of deposits in banks.

This statute, to be sure, does not absolutely exempt from all liability a public official who deposits public funds in a bank. Nor, I hold, was it intended to have that effect. Its language is plain; it gives *authority* for limited deposits, and nothing else. The origin of the statute was "An Act concerning Deposits of State Funds by the State Treasurer," constituting chapter 169 of the Public Acts of 1889. It was enlarged by amendment in 1899 (chapter 213, Pub. Acts 1899). In 1901 it was subjected to further enlargement and wedged in as section 18 of a long statute entitled "An Act concerning State Banks and Trust Companies," dealing in detail with that subject. Chapter 143, Pub. Acts 1901. In 1902, it appeared as section 1969 of the General Statutes under chapter 121, entitled "General Powers and Duties of Municipal Corporations, Boards, and Officers." Thus the history as well as the substance of the act suggests that its underlying purpose was to protect banks in receiving deposits from public officials as well as to protect officials who made deposits within the limitations of the act.

In its effect, with respect to the duties and liabilities of public custodians, section 512, Gen. St. 1930, is, I think, altogether analogous with the statutes pertaining to the investment of trust funds by private trustees. We have in Connecticut no statutes expressly prohibiting specified classes of investments by private trustees; none expressly defining the duties of trustees with respect to investments. We find only section 4836, Gen. St. 1930, stating that "trust funds, unless otherwise provided in the instrument creating the trust, *may be* loaned * * * or *may be* invested" in specified classes of investments. The statute affords neither absolute protection to the trustee with respect to authorized investments, nor does it impose absolute liability for losses from unauthorized investments. Thus it was said in State v. Washburn, 67 Conn. 187, at page 194, 34 A. 1034, that with respect to unauthorized investments "a trustee must justify such use of his funds by proof, not only of good faith, but of due diligence on his part in ascertaining the safety of the particular investment," and on page 196 of 67 Conn., 34 A. 1034, 1035, in the case of "unauthorized investments," the "good faith" of the trustee "cannot relieve him from liability." And in Clark v. Beers, 61 Conn. 87, 23 A. 717, in speaking of the liability of trustees under the same statute, it was said:

"If they invest in the securities expressly allowed by the statute, they will, except under very extraordinary circumstances, be protected, no matter how the investment may result. Acting within the express provisions of the statute would be, of itself, proof of good faith and sound discretion.

"All investments other than those named in the statute must be justified, when occasion requires, under the rigid rules applicable to investments made by trustees upon their own judgment."

And so, by analogy with the law relating to private trustees, I hold that a public custodian is not liable for funds deposited in conformity and within the limitations of section 512, except under extraordinary circumstances. All other deposits "must be justified, when occasion requires, under the rigid rules applicable to investments made by trustees upon their own judgment." Clark v. Beers, supra.

Not only did the state contemplate the free use of banks as public depositories, but such was its confidence in its banking system that it wholly omitted provision for taking security for the deposit of state funds from banking depositories, and even by statute (Gen. St. 1930, § 3935) waived its common-law priority as a claimant for funds on deposit in a closed bank. Bassett v. City Bank & Trust Co., 115 Conn. 393, 161 A. 852. Surely such confidence on the part of the state in its banking system is inconsistent with a policy to hold the agents of the state personally responsible for the continued solvency of banking depositories.

shall the deposit by such official in any one bank or trust company exceed in the aggregate at any one time thirty per centum of the capital, surplus and undivided profits of such bank or trust company; and provided whatever interest or other pecuniary consideration such bank or trust company shall allow for or upon such deposit shall belong to and accrue to the benefit of the state or such county, municipality or district. Nothing herein shall affect the provisions of the charter of any municipal corporation." Gen. St. Conn. 1930, § 512.

Moreover, section 512, discussed above, is by its express provision inapplicable to municipal charters. And in the charters of the three principal cities of the state, it is required that the city treasurer shall deposit city funds in such banks as shall be designated by the Board of Finance, New Haven Charter (1928) § 29; Hartford Charter (1931) § 53; or in banks of his own selection, Bridgeport Charter (1917) § 101. Municipal officers, conforming in good faith with such provisions, are not responsible for resulting losses. New Haven v. Fresenius, 75 Conn. 145, 151, 52 A. 823. The same reasoning is applicable to town treasurers who comply with section 512.

The policy of the state is further indicated by the provisions of section 442, Gen. St. 1930, which expressly authorizes the town treasurer, who is ex officio custodian of the town deposit fund, when any loan from the fund is paid to "deposit the proceeds at interest in any bank or trust company incorporated under the laws of this state." Certainly it cannot be held that deposits authorized by this statute subject the town treasurer to the liability of an insurer. See State v. Atchison, 105 Conn. 315, 135 A. 456.

And, finally, the policy of Connecticut is further indicated by Gen. St. 1930, § 4831, which requires that town treasurers, when acting as successor-trustees of public trusts, shall file annual statements showing (inter alia) "the names of all banks and depositaries where such trust money is deposited with the amount" of each deposit.

## Conclusions.

Altogether, considering the framework of the administrative machinery of the government of the state, and its policy in so far as declared by statutes, municipal charters and court decisions, even in the absence of a decision by any state court on the precise point here involved, I come to the following conclusions:

1. That the liability of a town treasurer in Connecticut for the safe-keeping of town funds is a matter to be determined in accordance with the law of the state.

2. That the law of the state, though heretofore not formally announced by state statute or reported judicial decision, imposes upon a town treasurer only the common-law liability of a bailee for hire except as modified by section 512 of the General Statutes.

3. That such a treasurer, with respect to deposits made in conformity with section 512, is responsible for losses resulting from the failure of the depository only if he acted in bad faith; that in the absence of bad faith he is not responsible.

4. That with respect to deposits not in conformity with section 512, he is responsible for losses in the absence of a showing that his conduct, though unauthorized, nevertheless conformed to the standard required of a bailee or trustee.

5. That the bond upon which this action is brought imposes upon the defendant surety a liability no higher in degree than the liability of its principal under the law as above stated.

## Rulings.

### Demurrer to the First Count Overruled.

This count alleges a breach of the bond in that the defendant's principal negligently and wrongfully failed to account for and pay over town funds in his care and custody.

1. The first ground of the demurrer to this count is that it does not appear in the first count that the alleged default on the part of the defendant's principal "occurred during the term for which said bond was given." This ground is without merit. For this count unequivocally alleges a failure to account for public funds in custody of the defendant's principal as treasurer "aforesaid"; that is to say, as treasurer from October 5 to December 29, 1931, which was the period alleged to have been covered by the bond sued upon.

2. The second ground of demurrer to this count is a claimed absence of allegation that the public moneys, for which the failure to account was assigned as the breach of the bond, were received by the defendant's principal during the term of the bond.

As to this, it is alleged in the first count that the term of the defendant's principal was from his election as town treasurer on October 5, 1931, until his resignation on December 29, 1931, and in effect that the bond sued upon covered this entire term; that the principal "received into his care and custody money belonging to said Town until the 29th day of December, 1931," when he "failed and neglected to account for and

pay over" the sum of $324,728.18 "of the money received by him and in his care and custody as treasurer aforesaid."

When it is alleged that the money was "in his care and custody as treasurer aforesaid," by necessary reference to the other allegations of this count, it was equivalent to an allegation that the money was in his care and custody as treasurer for the term from October 5th to December 29th. And since the failure to account for public moneys in his care during that term was a breach of the bond, State v. Hunter, 73 Conn. 435, 47 A. 665, this ground of demurrer is without merit.

■ 3. The third ground of demurrer was abandoned on brief but not formally withdrawn. It is directed largely to paragraph 7 of the first count, alleging the subsequent bankruptcy of defendant's principal. But this paragraph neither negatives nor vitiates the other paragraphs of the first count, which, I hold, state a good cause of action without aid from the allegations of paragraph 7. Nor can I believe that the defendant seriously claims that the bankruptcy of the principal, especially after default, impairs the right of the obligee to hold the surety.

4. The fourth ground of demurrer likewise was abandoned on brief but not withdrawn. It has no merit.

5. Likewise as to the fifth ground, which is so lacking in particularity as to be without effect. Gen. St. 1930, § 5507.

6. Likewise as to the sixth ground.

The foregoing rulings, it may be observed, leave it open to the defendant, if it wishes, to plead as a defense to this count the failure of the bank with funds of the plaintiff there on deposit. Such an answer could be avoided by a reply alleging that the deposits were made and maintained by defendant's principal negligently, without good faith and without conformity with section 512. Issues thus broadly framed would seem to comprehend the smaller causes of action stated in the second and fourth counts, which could then be withdrawn and thus simplify the pleadings.

### Demurrer to Second Count Overruled.

■ The second count as amended alleges that the defendant's principal, who at all times mentioned herein was the treasurer of the plaintiff town and also a director and vice president of the Hamden Bank & Trust Company, on October 5, 1931, had on deposit in said bank in various accounts an aggregate sum of almost $400,000 belonging to the town; that he thereafter made further deposits of public money in said bank until December 17, 1931, when the bank was closed on order of the State Bank Commissioner; that at the closing of said bank the principal "negligently and in violation of his duty as treasurer" had a deposit of public funds in said bank "to an amount exceeding, by more than the amount of said bond (that is, the surety bond furnished by the defendant upon which this action is based) the amount permitted by section 512 of the General Statutes of the State of Connecticut, Revision of 1930"; and that, due demand having been made, he has "negligently and in violation of his duty as treasurer" failed to pay over said public money on deposit as aforesaid. Thus the second count, by this reference to the statute, alleges in effect an aggregate deposit of public money in said bank exceeding "thirty per centum of the capital, surplus and undivided profits of" said bank.

1. The first ground of demurrer to this count is because it does not appear that the alleged excess deposit was made during the term for which said bond was given. This ground is without merit.

If deposits when made in excess of the limitation of section 512 are unauthorized, necessarily the continuance of such deposits is unauthorized. This count sufficiently alleges a breach of official duty in negligently maintaining and continuing unauthorized deposits.

■ 2. The second ground of demurrer to this count is because the alleged excess deposit was made prior to the date when said bond was given. The complaint, however, does not so allege. By its amendment it is alleged that almost $400,000 was deposited during the term in question, and that over $300,000 was on deposit when the bank closed. Certainly this cannot be taken as the equivalent of an allegation that the $300,000 on hand at the closing was deposited prior to the term of the bond.

■ And in any event, as I construe section 512, aggregate deposits at the time of closing in excess of the statutory limitation would constitute, at least prima facie, a breach of the bond irrespective of the dates on which the individual deposits making up the aggregate were made.

■ 3. As a third ground of demurrer to the second count, the defendant claims that

its principal had authority and power to deposit the public funds in question in the Hamden Bank & Trust Company—a power "expressly given by the General Statutes." But, as we have seen, section 512 of the General Statutes, which is the only relevant statute to which attention has been called, expressly limits that power, and in the second count it is sufficiently alleged that defendant's principal exceeded the statutory limitation.

■ 4. The fourth ground of demurrer to the second count is because the complaint fails to state the permissible amount of deposit under section 512 of the General Statutes, and the amount of the claimed excess. No such allegation is necessary to state a cause of action. It is sufficient to allege deposits negligently made or maintained, or made in excess of the statutory limitation.

5. Likewise as to the fifth ground of demurrer to the second count.

■ 6. The sixth ground of demurrer to the second count questions whether the plaintiff has sufficiently alleged that it has sustained damage as a result of the alleged excess deposits. The allegation of failure to pay over the town funds negligently deposited is enough to state a cause of action. The possibility of liquidating dividends from the bank does not affect the liability of the defendant surety. National Lead Co. v. Montpelier Hardware Co., 73 Vt. 119, 50 A. 809.

7. The seventh ground of demurrer to the second count is similar to the sixth and is likewise insufficient.

■ 8. The eighth ground of demurrer to the second count is because the defendant is not a "guarantor" of the solvency of the Hamden Bank nor of the deposits made by its principal therein. As to this, it is necessary only to remark that the second count seeks to hold the defendant only for the loss resulting from the breach of duty by the principal in making unauthorized and negligent deposits.

■ 9. The ninth ground of demurrer is too general to require attention. However, it may be observed that any conclusion of law set forth in the second count may be disregarded as surplusage without affecting the sufficiency of the cause of action therein stated.

10. The tenth ground of demurrer to the second count likewise lacks sufficient particularity to require attention.

### Demurrer to Third Count Sustained.

■ The third count alleges that after banking hours on December 16, 1931, which was the last day on which the bank was open for business, defendant's principal surrendered certificates of deposit theretofore issued by the bank to him as town treasurer in return for a quantity of notes, checks, and cash, all of which, after the closing of the bank, he later returned to the bank's receiver.

1. The first ground of demurrer is wholly lacking in particularity and deserves no consideration.

2. Likewise as to the second ground.

3. The remaining grounds of demurrer to this count (grounds 3 to 7, inclusive) in substance are based upon the contention that the town was not damaged by the transactions alleged in the third ground, and therefore no action lies thereon.

Even though this count were considered as alleging irregular conduct on the part of defendant's principal, and even though that conduct might technically constitute a breach of official duty, no damage to the plaintiff is shown. By the transaction herein complained of, the position of the plaintiff suffered no change whatever. After the transaction, as before, the plaintiff's claim as a depositor was the same. Without a bond, no liability would attach to defendant's principal for this transaction. Having received nothing thereby, he was not liable in assumpsit. Having caused no injury, he was not liable in tort. The bond cannot serve to create a liability where none before existed.

In State v. Atchison, 105 Conn. 315, 135 A. 456, 459, in speaking of the responsibility of the town treasurer as custodian of the town deposit fund, it was said: "If the town had taken a bond from its agent, as required by the statute to which we referred, it could have proceeded against him, for any loss which it could prove it had suffered by his acts, but the finding does not show that the town has ever lost anything by the acts of Hawley. By far the larger part of the fund has been traced directly into the treasury of the town." See, also, Hartford v. Franey, 47 Conn. 76.

### Demurrer to Fourth Count.

■ This count alleges that defendant's principal, who was also vice president of the bank, with knowledge that the bank was unsound, wrongfully and negligently

744

deposited plaintiff's money therein, with the intent thereby to improve the condition of the bank; that this deposit was continued until the closing of the bank (Exhibit A) and has never been paid over to the plaintiff.

The seven grounds of demurrer to this count are similar to those already discussed and ruled upon.

The third ground, viz., that no damage to the plaintiff resulted from its treasurer's breach of duty, is clearly without merit with respect to this count.

The allegations of this count, unexplained, show bad faith on the part of defendant's principal within the meaning of the conclusions of law above stated. For losses thus caused, both principal and surety are liable, irrespective of Gen. St. 1930, § 512.

It follows, then, that the demurrer with respect to the third count is sustained; but in all other respects overruled.